# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| FRANK WUTERICH | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 06-1366 (RMC) |
| | * | |
| JOHN MURTHA | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## OPPOSITION TO MOTION TO SUBSTITUTE DEFENDANT
## AND DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### (ORAL ARGUMENTS REQUESTED)

On November 19, 2005, a tragic incident that unfortunately is witnessed in every conflict throughout the history of warfare occurred in the city of Haditha, Iraq. A Marine squad that was following the rules of engagement prescribed by the U.S. Marine Corps, responded with force in the aftermath of an IED explosion and a perceived enemy insurgent coordinated attack. In the aftermath, sadly, as many as 24 civilians were mistakenly killed.

Plaintiff Frank Wuterich ("Wuterich"), the squad leader of the Marines engaged in the Haditha battle, brought defamation and false light claims against defendant John Murtha ("Murtha") for asserting that Wuterich, as part of an easily identifiable group of Marines, was a "cold-blooded" killer, among other disparaging and unproven comments. Rather than substantively – or even personally – respond to these claims, Mr. Murtha, a sitting member of the U.S. House of Representatives, seeks to hide behind a purported cloak of immunity and has brought the United States Government into this litigation to fight his battle for him.

However, at this very early juncture of the litigation, Mr. Murtha is neither entitled to immunity nor is the United States Government an appropriate intervening party to this action. Before either of these steps can take place Wuterich is entitled to limited discovery – to include at a minimum deposing Mr. Murtha – in order to challenge the defendant's scope of employment claims and the Westfall Certification filed by the United States Attorney's Office.

Let it first be made quite clear. This case is not about the War in Iraq or Mr. Murtha's opposition to it. The legitimate public debate regarding whether the United States should or should not have entered Iraq, or at what point in time our troops should or should not withdraw is an unrelated distraction, both as a matter of fact and law. Neither Wuterich nor this lawsuit takes a position or seeks to debate those questions, or Mr. Murtha's views on the topic.

What this lawsuit addresses is the irresponsible and false statements spread by Mr. Murtha, without any substantive basis, against a group of young Marines – led by Wuterich – who were risking their lives in a dangerous situation that turned tragic. Mr. Murtha's conduct was unbecoming that of Marine, much less a serving U.S. Congressman, and he should be held personally accountable for his intentional actions.

## FACTUAL BACKGROUND

On November 19, 2005, Wuterich, who has since been promoted from the rank of Sgt to Staff Sergeant, served as the leader of 1st Squad, 3rd Platoon, Kilo Company, 3rd Battalion, 1st Marine Regiment. Early that morning he was in a Humvee convoy of four vehicles that was hit by a roadside bomb, otherwise known as an IED (improvised explosive device). The attack resulted in the death of one of their colleagues, Lance Cpl. Miguel Terrazas. Complaint at ¶7 (filed August 2, 2006).

Wuterich, who was driving the second Humvee, immediately stopped the convoy. A white, unmarked car full of "military-aged men" was observed lingering near the incident site. The Marines were understandably concerned that this unmarked vehicle was possibly set to explode or that the individuals inside were about to engage in an armed attack. Such coordinated, multi-stage attacks were not uncommon. Although these men were ordered in Arabic to stop, they proceeded to take steps to run from the vehicle instead. Several Marines opened fire and killed the men. Id. at ¶8.

A Marine in Wuterich's squad officially reported to his headquarters that there had been an IED attack and called for a Quick Reaction Force (QRF). The first QRF group encountered an unexploded bomb on a nearby route. This fueled concerns that insurgents were mounting a coordinated attack on the daily morning convoy. As a result a second QRF was called in as well. That group, including Marines with the 3rd Squad and the platoon's leader, a young second lieutenant, arrived on the scene shortly thereafter. Id. at ¶9.

As Wuterich began briefing the platoon commander, AK-47 shots rang out from the south side of the road. One or more of the Marines personally saw bullets striking the ground around them. It was believed the shots originated from a specific house, and after a discussion with the platoon leader, they decided to clear the house. A four-man team of Marines, including Wuterich, kicked in the door and found a series of empty rooms. They quickly noticed that there was one room with a closed door and they heard people rustling behind it. They then kicked in that door and, based on the rules of engagement as they understood them to be, tossed a fragmentation grenade into the room. One Marine, who had experience clearing numerous houses from a deployment in Fallujah, fired a series of

3

"clearing rounds" through the dust and smoke, killing several people, who later turned out to appear to be civilians. Id. at ¶10.

Following the clearing of the first house it was believed that insurgent(s) had slipped out the back door to a second house nearby. The Marines moved to that house, kicked in the door, killed one man inside and then, by following the understood rules of engagement, used another fragmentation grenade and gunfire to clear another room full of possible insurgents. Id. at ¶11.

Wuterich, not having specifically found identifiable insurgents, told the team to stop and headed back to the platoon leader to reassess the situation. At no time did the Marines ignore pleas or cries from civilians to spare them. Any accusation that the Marines "executed" civilians or deliberately targeted noncombatants is either a horrendous misunderstanding or intentional lie. After clearing the second house, Wuterich called on the radio and reported the "collateral damage." When the company radio operator asked him to estimate how many civilians had been killed, he said he thought it was about 12 to 15. The platoon leader, who was on the scene, never expressed concern regarding the unit's actions and never tried to hide what took place. Id. at ¶12.

After going through the houses, Wuterich moved a small group of Marines to the roof of a nearby building to watch the area. They saw a man in all black clothing running from one of the houses they had searched. The Marines killed him. Id. at ¶13.  They then noticed another man, also in all black clothing, scurrying between two houses across the street and repeatedly observing the Marines' observation post. When they went to investigate, the Marines found a courtyard filled with women and children (all of whom were treated with respect and obviously never targeted despite being witnesses to the

ongoing events) and asked where the man was. When the civilians pointed to a third house, the Marines entered and found at least one of the men armed with an AK-47. This individual was flanked by three other men. The armed individuals attempted to fire their weapons and the Marines killed them in defense. Id. at ¶14.

The unit stayed at the scene for hours, particularly to help collect bodies. They were well aware that photographs were being taken, and indeed the Marines took photographs themselves to document the incident, yet no one took any actions to interfere with the photography or to hide or cover-up anything that occurred. For months no one questioned the actions of Wuterich or his squad.

Subsequent statements that were spread by Iraqis in the Haditha neighborhood were intentionally false or mistaken, including accusations that the Marines had lined civilians up against the wall and executed them. It is a known tactic of insurgents and those Iraqis opposed to the U.S. presence in Iraq to fabricate or exaggerate incidents in order to implicate U.S. forces in war crimes or other unlawful or inappropriate conduct. Id. at ¶15. Nevertheless, these allegations led to a *Time Magazine* reporter initiating inquiries about what occurred on November 19, 2005.

Prior to *Time Magazine* bringing public attention to the Haditha tragedy in or around March 2006, at no time prior to that time did any serious inquiry or questions ever arise about the events of that day notwithstanding the fact that many up the chain of command knew what happened. U.S. reporters who were in or around the proximity of Haditha on November 19, 2005, and who knew many of the members of the 1st Squad, 3rd Platoon, Kilo Company, 3rd Battalion, 1st Marine Regiment, neither witnessed nor heard that any event that took place that day was controversial or suspect. Id. at ¶16.

Wuterich has been publicly identified as the leader for his squad and linked to the Haditha tragedy, at least since May 25, 2006 when he was mentioned by ABC News as someone being investigated as part of the military probe into the events of November 19, 2005. Of course, anyone who was familiar with the squad prior to that time would know of his relationship to the events of that day. But now any comments uttered about what happened that day inexplicably apply to him in the eyes of the public. Id. at ¶17.

In or about Spring 2006, Mr. Murtha was one of several congressional members in the House of Representatives and U.S. Senate who was apparently provided information by officials within the Department of Defense concerning the ongoing investigation into the Haditha tragedy. According to news reports Mr. Murtha was briefed by, among others, Marine Commandant General Michael Hagee. Mr. Murtha had no legitimate need-to-know of any information relating to the specific circumstances of the Haditha investigation. Id. at ¶18.

Mr. Murtha has made repeated statements concerning the Marines involved in the tragic incident, which included Wuterich, that are defamatory in nature. Indeed, he has even inappropriately compared the tragic events of Haditha with the infamous war crimes and deliberate wide-spread massacre of civilians at My Lai in Vietnam. Many of these comments were uttered outside of Mr. Murtha's scope of employment as a Congressman. Id. at ¶20.

Following the filing of his Complaint, Wuterich was charged with thirteen counts of unpremeditated murder for events arising from the November 19, 2005, incident in Haditha. *http://www.usmc.mil/lapa/Iraq/Haditha/Haditha-Preferred-Charges-061221.htm*. At the time of the filing of this Opposition, neither an Article 32 hearing or

much less a trial on the merits has been held. While some may look to the charges as vindicating Mr. Murtha's statements, it is to the contrary. The charges alone, and the Marine Corps press conference that was held at the time of announcement, already actually unequivocally refute many of Mr. Murtha's outrageous statements such as that the killings were committed in "cold-blood" (premeditated) and that Wuterich and his Marines were not fired upon."[1] "Republican Iraq critic Murtha under fire on two fronts," *Philadelphia Inquirer*, Aug. 3, 2006, attached at Exhibit "1"; Official Marine Press Statement of Col. Stewart Navarre, Dec. 21, 2006 ("On the morning of 19 November 2005, a four vehicle convoy of Marines from Kilo Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division was moving through Haditha when it was ambushed by insurgents employing an improvised explosive device *and small arms fire*."), attached at Exhibit "2" (emphasis added)(a copy can also be found at *http://www.usmc.mil/lapa/Iraq/ Haditha/ Haditha-Press-Statement-061221.htm*). Thus, the United States Government itself – the very entity now seeking to substitute itself for Mr. Murtha – has already proven some of the substantive claims underlying this lawsuit.[2]

Because this case is about accountability and integrity rather than money damages or politics, Wuterich offered Mr. Murtha an opportunity to resolve this dispute through a simple retraction. See Exhibit "3" An identical offer was conveyed to Congressman John

---

[1] For example on May 19, 2006, CNN reported Mr. Murtha publicly and conclusively stated that the Marines "overreacted and killed a number of civilians without anybody firing at them. That's what you're going to find out."

[2] Additionally, individuals, such as General Hagee, who Mr. Murtha claimed to have provided him with the defamatory information that led to the filing of this lawsuit, challenged his recollection of how he came to be in possession of the information. See Exhibit "1".

Kline, who was subsequently identified as having allegedly disseminated defamatory remarks concerning the involved Marines. See Exhibit "4". Congressman Kline recognized that statements of that nature were premature and inappropriate and, immediately to his credit, issued a public apology. See Exhibit "5".

Unfortunately, Mr. Murtha never had the courtesy to respond to the offer, which brings us to the current situation.

## ARGUMENT

Mr. Murtha seeks to dismiss this case, not on substantive grounds, but on alleged procedural defects regarding subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

Federal courts are, of course, courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288-89 (1938); see also Gen. Motors Corp. v. Envtl. Prot. Agency, 363 F.3d 442, 448 (D.C.Cir. 2004)(noting that "[a]s a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction"). Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no action of the parties can confer subject-matter jurisdiction upon a federal court.'" Akinseye v. Dist. of Columbia, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982).

On a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject-matter jurisdiction. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). The court may

dismiss a complaint for lack of subject-matter jurisdiction only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Empagran S.A. v. F. Hoffman-Laroche, Ltd., 315 F.3d 338, 343 (D.C. Cir. 2003), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Because subject-matter jurisdiction focuses on the court's power to hear the claim, however, the court must give the plaintiffs' factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. Macharia v. United States, 334 F.3d 61, 64, 69 (D.C.Cir. 2003); Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Moreover, the court is not limited to the allegations contained in the complaint. Hohri v. United States, 782 F.2d 227, 241 (D.C.Cir. 1986), vacated on other grounds, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings. Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C.Cir. 1992).

## I.  WUTERICH'S CLAIMS ARE COGNIZABLE BECAUSE MURTHA ACTED OUTSIDE OF HIS SCOPE OF EMPLOYMENT THEREBY RENDERING HIM, AND NOT THE UNITED STATES, AS THE PROPER DEFENDANT SUBJECT TO LIABILITY

The Government sets forth three arguments: (1) that the United States must be substituted for Mr. Murtha as the sole defendant based on the allegation that he was acting within his scope of employment; Memorandum in Support of Motion to Substitute Defendant and Dismiss Plaintiff's Claim for Lack of Subject Matter Jurisdiction at 7-12 (filed May 7, 2007)("Def's Memo"), (2) that Wuterich has failed to file an administrative claim pursuant to the Federal Tort Claims Act ("FTCA"), id. at 12-14 and (3) that Wuterich cannot maintain an action against the United States for libel due to sovereign

immunity. Id. at 14-15. As explained below, only the first argument is truly at issue in this litigation.

When a federal employee is sued for a wrongful or negligent act, the Federal Employees Liability Reform and Tort Compensation Act of 1988 (commonly known as the Westfall Act) provides that:

> [u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679 (d)(1). Upon a *successful* invocation of the certification, the individual employee is dismissed from the case and the United States is substituted as defendant. The case would then proceed under the FTCA, which confers immunity to the Government for claims of libel and slander. See 28 U.S.C. § 2680(h). The Government has not yet been substituted for Mr. Murtha as the defendant in this action. Indeed, the Government is entitled to be substituted *only* if Mr. Murtha was acting within the scope of his employment. If he was not, the Government has no role to play in this litigation, and Mr. Murtha must defend himself as any true Marine would.

Thus, the Government's second and third arguments only apply if the United States is substituted as the party-defendant rendering the instant action one governed by the FTCA. No decision of this nature has yet been made by the Court. Actually, Wuterich agrees that if the United States is properly substituted as the defendant in place of Mr. Murtha, his lawsuit stops there. The United States is unequivocally immune from his tort claims. That outcome has not yet materialized though.

Therefore, for purposes of this Motion, the only real issue is whether or not Mr. Murtha is entitled to have the United States Government substituted in his place on the

basis of a certification that Mr. Murtha acted in the scope of employment when he uttered the defamatory statements.

### A.  The Submitted Assistant United States Attorney's Certification Is Inadequate To Justify Substitution At This Time

In order to support Mr. Murtha's request for substitution, the Government has submitted a May 7, 2007, certification from Rudolph Contreras, Assistant United States Attorney, Chief, Civil Division, Office of the United States Attorney for the District of Columbia.[3] Def's Memo at Exhibit "8". The mere fact that an Assistant United States Attorney has certified Mr. Murtha was acting in the scope of his employment is not enough to justify unfettered substitution.

In Gutierrez de Martinez v. Lamagno, 515 U.S. 417 (1995), the Supreme Court held that a certificate of scope of employment is conclusive for purposes of removal from state court only, not substitution. District courts are to review the certification attempt. Without such review, the Court held, the scope of employment issue "however contestable in fact, would receive no judicial audience," and federal courts would be reduced to "rubberstamp work." Id. at 429.

Even before the Supreme Court issued its ruling in Gutierrez de Martinez, the D.C. Circuit had the foresight to opine that "regardless of the content of the certification ... the federal district court must at least conduct an evidentiary hearing on the scope issue." Kimbro v. Velten, 30 F.3d 1501, 1508 (D.C. Cir. 1994). "This procedure," the court continued, is "in keeping with the statutory scheme [,which] does not really treat the certification as having any particular evidentiary weight...." Id. The Court also considered the weight to which the Government's certification is entitled and adopted the approach

---

[3] Under 28 C.F.R. § 15.4, the Attorney General has delegated to the United States Attorney the authority to provide § 2679(d) certification. Mr. Contreras notes that this authority was further delegated to him on March 20, 2006. While there is no evidence to support such claim, Wuterich presumes it is true for purposes of this response.

of the Third Circuit as expressed in <u>Melo v. Hafer</u>, 13 F.3d 736 (3d Cir. 1994). In <u>Hafer</u>, the Third Circuit treated the certification as entitled to "*prima facie* effect" but stated that:

> if the Attorney General's certification is based on a different understanding of the facts than is reflected in the complaint, the plaintiff should be permitted reasonable discovery and should then be called upon to come forward, as if responding to a motion for summary judgment, with competent evidence supporting the facts upon which he would predicate liability, as well as any other facts necessary to support a conclusion that the defendant acted beyond the scope of his employment.

Following the Supreme Court's decision in <u>Gutierrez de Martinez</u>, the D.C Circuit reiterated its position in <u>Stokes v. Cross</u>, 327 F.3d 1210 (D.C. Cir. 2003), stating that the certification

> is *not* conclusive regarding substitution of the federal government. Instead, the federal court may determine independently whether the employee acted within the scope of employment and, therefore, whether to substitute the federal government as the proper defendant.

<u>Id</u>. at 1215 (emphasis original)(internal citations omitted). <u>Accord</u> <u>Council on American Islamic Relations v. Ballenger</u>, 444 F.3d 659, 662 (D.C. Cir. 2006).

In his May 7, 2007, certification, Mr. Contreras states as a simple matter of fact that Mr. Murtha was "acting within the scope of his employment as an employee of the United States at the time of the alleged incidents." <u>See</u> Def's Memo at Exhibit "8".In reaching his position, Mr. Contreras relies upon his reading of the Complaint <u>and</u> "on the basis of information now available to me with respect to the incidents alleged therein." <u>Id</u>. This Certification raises several significant concerns that support this Court's rejection of the substitution request at this time.

First, merely citing to generic references to the "incidents alleged therein" is insufficient to satisfy the necessary standard to justify substitution. For one thing, what is

the factual "basis of information" that was made available to Mr. Contreras?[4] The

Government has failed to detail even one pertinent fact. Moreover, as multiple incidents

make up the claims against Mr. Murtha, the scope of employment test must be applied

specifically to each of the acts or incidents contained in the complaint that make up each

claim, rather than broadly to the claims or complaint as a whole. See Lyons v. Brown,

158 F.3d 605, 608-09 (1st Cir. 1998).

Second, according to the certification, Mr. Contreras reached his determination, at

least in part, by reviewing Wuterich's Complaint. It is unreasonable to believe that the

facts in the Complaint, which is obviously drafted to rely upon favorable factual and legal

references designed to support Wuterich's case, significantly contributed to a decision

that Mr. Murtha was acting in the scope of his employment. If anything, it does quite the

opposite. Thus again, what is the other "available information" shared with Mr. Contreras

that contradicts Wuterich's detailed assertions. Not one fact is provided to this Court by

Mr. Contreras. Although the government's certification may have initially satisfied its

prima facie burden, it carries no evidentiary weight because it neither contains any

"details" or "explains the bases for its conclusion." Maron v. United States, 126 F.3d 317,

323 (4th Cir. 1997).[5] See also Wood v. United States, 995 F.2d 1122, 1123 (1st Cir.

---

[4] 28 C.F.R. § 15.3 would appear to have required the U.S. House of Representatives to submit an agency report to the U.S. Attorney's Office "fully addressing whether the employee was acting within the scope of his office or employment with the Federal Government at the time of the incident out of which the suit arose" There is no indication within the record that either this was done, or that if it was it was reviewed by Mr. Contreras.

[5] The burden of proof to refute the certification of scope of employment admittedly falls on Wuterich to "prove by a preponderance of the evidence that the defendant[] [was] not acting within the scope of [her] employment." Maron, 126 F.3d at 323. If Wuterich can so demonstrate, then the government "must provide evidence and analysis to support its conclusion that the torts occurred within the scope of employment." Id. Wuterich has done so. The Government has not.

1993)(Westfall Act certificate cannot simply deny the basic "incident" charged); <u>McHugh v. University of Vermont</u>, 966 F.2d 67 (2d Cir. 1992)(same).[6]

At this early juncture of the litigation, and particularly given the fact that the relief requested by Mr. Murtha/U.S. Government is outright dismissal of Wuterich's lawsuit, a bare bones Westfall Certification is insufficient to support substitution. As a result, before such decision can be reached, discovery is warranted.[7]

### B. Mr. Murtha Has Not, And Cannot Yet, Demonstrate He Was Acting In The Scope Of His Employment When He Spread Some Of His Defamatory Statements

If this Court treats the Government's Westfall Certification as valid, the scope of employment inquiry of whether Mr. Murtha was acting within the line of duty is defined by the applicable state law of respondeat superior. An analysis of the relevant law and known facts similarly supports the denial of the Government's Motion and justifies discovery.

Assuming the certification "constitute[s] *prima facie* evidence," <u>id</u>. citing <u>Kimbro</u>, 30 F.3d at 1509, Wuterich has the burden of proving the opposite "by alleging facts that, if true, would establish that the defendant[] [was] acting outside the scope of [his] employment." <u>Stokes</u>, 327 F.3d at 1215. In determining whether a federal employee was acting within the scope of his employment, the Court would apply the law of the District of Columbia, which is drawn from the Restatement (Second) of Agency. <u>Haddon v. United States</u>, 68 F.3d 1420, 1423 (D.C. Cir. 1995); <u>accord</u> <u>Council on American Islamic</u>

---

[6] Given this position the Government's certification should be vacated or striken from the record, which thereby requires the denial, without prejudice, of the pending Motion. A Motion to Vacate or Strike, and for Discovery has been contemporaneously filed.

[7] A nearly identical Westfall Certification seeking substitution was submitted by the U.S. Attorney's Office for the District of Maryland in <u>Elders v. Diaz</u>, Case No. MJG-02-3892 (D.Md.). <u>See</u> Exhibit "6". It was rejected and the plaintiff, who was represented by the undersigned counsel, was permitted to engage in limited discovery to include the defendant's deposition. <u>See</u> Exhibit "7".

Relations, 444 F.3d at 663. "Although scope of employment is generally a question for the jury, it 'becomes a question of law for the court, however, if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment.'" Id., quoting Boykin v. District of Columbia, 484 A.2d 560, 562 (D.C. 1984)(collecting cases).

"[A]n employee's conduct falls within the scope of employment if: 1) it is of the kind of conduct he is employed to perform; 2) it occurs substantially within the authorized time and space limits; 3) it is actuated, at least in part, by a purpose to serve the master; and 4) if force is intentionally used by the servant against another, the use of force is not unexpected by the master." Majano v. U.S., 469 F.3d 138, 141 (D.C. Cir. 2006), citing Restatement (Second) of Agency § 228 (1957).[8]

Rather than dignify the importance of this litigation by making even a subtle attempt to defend his own statements, Mr. Murtha solely relies upon the declaration of Cynthia Abram ("Abram"), his former Communications Director, in order to demonstrate he acted within the scope of his employment when spreading the defamatory allegations. Not surprisingly, Ms. Abram never specifically addresses the factual circumstances in dispute. Indeed, she does not indicate that she is even familiar with many of the relevant facts as they have been alleged to exist. Nor does she address each and every one of the statements made by Mr. Murtha or any of the third-party republications.[9]

---

[8] The Government has also set forth the applicable standard for the State of Pennsylvania, see Def's Memo at 12, citing Shuman Estate v. Weber, 419 A.2d 169, 173 (Pa. Super. 1980). As the underlying factors are substantially the same as those applied by the District of Columbia they will not be separately analyzed at this time.

[9] Of course, Wuterich never claimed that the media statements identified in his Complaint constitute the full universe of Mr. Murtha's defamatory comments. In fact, the three Counts that were pled made it quite clear that the listed statements "include, but are not limited to, the following", see e.g., Complaint at ¶¶26, 26, 41; further supporting the need for limited discovery to ascertain the full extent of Mr. Murtha's media comments. *See infra* Section II(C).

There have been few reported cases involving defamation charges filed against Members of Congress in the history of the United States, and barely even a handful since the Westfall Act was enacted nearly twenty years ago. See e.g., Council on American Islamic Relations, 444 F.3d at 661; Williams v. United States of America, 71 F.3d 502 (5th Cir. 1995); Chapman v. Rahall, 99 F.Supp.2d 711 (W.D.Va. 2005); Operation Rescue National v. United States, 975 F.Supp. 92 (D.Mass. 1997), aff'd 147 F.3d 68 (1st Cir. 1998).

It is true that courts in this district have noted that "speaking to the press is a critical part of the expected and authorized conduct of a United States Congressman." Council on American Islamic Relations, 366 F.Supp.2d at 31. Based on the specific facts of that case, the D.C. Circuit noted that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" Id. 444 F.3d at 665. However, there is no indication, nor case law, that would seemingly endorse a view that every single circumstance where a congressman speaks to a member of the media falls within the scope of employment and thereby is entitled to immunity. Indeed, on this very point, the D.C. Circuit made it quite clear that its statement was not to be accorded a broad preclusive effect to every single instance in which a congressman spoke to a member of the media. "This case, like every judicial decision, cannot be divorced from its facts. To be sure, it involves a statement by a congressman to the press. But our *ratio decidendi* necessarily depends on the context in which the statement was made." Council on American Islamic Relations, 444 F.3d at 666.

There are a few factual distinctions that appear readily evident that could call into question whether Mr. Murtha was acting within the scope of employment.

For one thing, it appears that in the other congressional cases the representative was *responding* to an unsolicited reporter's inquiries about specific pre-existing personal or legislative matters rather than creating the very situation, as Mr. Murtha did, to generate

the media inquiry. <u>Chapman</u>, 399 F.Supp.2d at 714-15; <u>Operation Rescue National</u>,

975 F.Supp. at 95.

Yet another is that three of the media interviews given by Mr. Murtha, it is conceded,

occurred in his "campaign office". Def's Memo at 6. This is significant as the campaign

office is politically separate from that of a congressman's district or Washington, D.C.

office. There is a very important line of distinction that exists between the two, which is

why Ms. Abrams specifically tries to justify its use. It is argued that this location was

used "not because they were campaign related, but for the convenience of the

broadcasters…." <u>Id</u>. Beyond the fact that this is a hearsay statement that may or may not

be true (and which should be subject to challenge), it is this type of subtle distinction that

can have a significant impact on a claim of immunity. For example, a lawyer has

immunity for statements uttered during oral arguments within the courtroom, <u>see</u> Smolla,

LAW OF DEFAMATION, §§ 8:8, 8:9 (2d Ed. 2005), but should he step just a few feet

outside onto the courthouse steps, even if it were far more convenient for the filming

cameras and note-pad reporters, and repeat the identical statement, that immunity

evaporates and liability may attach. <u>Id</u>. Wuterich submits it should be no different for Mr.

Murtha.

Unlike in some of the other congressional immunity cases, there was no specific

legislation pending that pertained to the Haditha events.[10] To be sure, issues surrounding

the war in Iraq were and are repeatedly debated in Congress. Yet no other Member of

---

[10] Mr. Murtha apparently seeks to tie H.J. Res. 73, which pertained to redeployment of U.S. troops from Iraq, to his defamatory statements concerning Wuterich. Def's Memo at Exhibit "4". H.J. Res. was introduced not only seven months prior to his utterance of the defamatory statements in question but even before the incident in Haditha occurred. There is no relationship between the two. Even in his comments to the media Mr. Murtha does not attempt to link redeployment with Haditha. <u>Id</u>. at Exhibit "6". Instead, he proceeds on tangents wherein he unequivocally concludes Wuterich and his Marines are war criminals even before any official investigation had concluded anything of the sort. In fact, the only official Government investigation that had been concluded at the time Mr. Murtha was defaming Wuterich concluded "there are no indications that [Coalition Forces] <u>intentionally</u> targeted, engaged and killed non-combatants." <u>See</u> Exhibit "8" at 3.

Congress saw fit to tie Haditha, much less offer factual conclusions of guilt, to any

legislative responsibilities. Notably, those representatives who were questioned by the

media about the incident made it implicitly, if not explicitly, clear that it was

inappropriate to do exactly what Mr. Murtha saw fit to do – prematurely condemn the

Marines as guilty before a full investigation or trial had been completed.

> If there were problems in the chain of command, if there was a cover-up, if
> anything wasn't reported, let the chips fall where they may. But don't
> presume anything. Those reports aren't finished yet. But the reports and the
> investigations are being pursued with great integrity.

CNN, May 19, 2006, The Situation Room (Statement of Congressman Duncan Hunter)

> In the interim, frankly, the public opinion on this matter is being
> influenced by misinformation, leaks and undocumented and
> uncorroborated facts.

"Iraqi Accuses U.S. of 'Daily' Attacks Against Civilians", *New York Times*, June 2, 2006

(statement of Senator John Warner).[11]

> I can't say until we really know what happened. There are allegations, and
> I emphasize allegations, that there was a cover-up.

Id. (Statement of Senator John McCain). See also "Murtha jumps gun on Haditha",

*Grand Rapid Press*, June 2, 2006, attached at Exhibit "9"; "Murtha's irresponsible

remarks", *Washington Times*, May 20, 2006, attached at Exhibit "10"; Exhibit "5" (Cong.

Kline apology).

There were numerous ways in which Mr. Murtha could have referred to the Haditha

incident without expressing a categorical conclusion that the Marines, including

Wuterich, were guilty of atrocious war crimes that would subject them to the death

---

[11] In commenting upon holding hearings on the topic of Haditha and the Defense
Departments sharing of information, Senator Warner also stated: "Well, there have been
discussions between myself and the secretary and the deputy secretary, but I find no
reluctance on the part of the secretary to withhold from the Congress and the public facts.
But I think the secretary is correct in waiting until the various investigations are
completed. They're the ones that can best corroborate and put an official imprimatur on
the facts." State News Service, June 13, 2006.

penalty. Because there is no blanket grant of immunity accorded congressional statements to the press, Mr. Murtha's comments can be determined to fall outside of his scope-of-employment.

### C. A Factual Dispute Still Remains Regarding Scope Of Employment Thereby Entitling Wuterich To Limited Discovery And An Evidentiary Hearing

Beyond proving that the Government's certification is procedurally and factually deficient and should be vacated/stricken from the record, Wuterich believes he has presented sufficient facts based on his pleadings and documentary evidence to persuade this Court to deny the Government's attempt to substitute itself in Mr. Murtha's place at this early stage.[12]

In any event, it is common practice - and indeed essential to ensure fairness and due process - for district courts to first allow at least limited discovery in order to resolve factual disputes that bear on a scope-of-employment issue, including in cases alleging defamation. See e.g., Stokes, 327 F.3d at 1214; Ross v. Bryan, 309 F.3d 830 (4th Cir. 2002); Borneman v. United States, 213 F.3d 819 (4th Cir. 2000); Maron v. United States, 126 F.3d 317 (4th Cir. 1997); Aliota v. Graham, 984 F.2d 1350 (3d Cir. 1993), cert. denied, 126 L.Ed.2d 37 (1993); Schrob v. Catterson, 967 F. 929 (3d Cir. 1992); McHugh, 966 F.2d at 74; Brown v. Armstrong, 949 F.2d 1007 (8th Cir. 1991); Nasuti v. Scannell, 906 F.2d 802.

---

[12] Rule 8's liberal pleading standard requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and courts are charged with construing the complaint "so ... as to do substantial justice," Fed. R. Civ. P. 8(f). The Rules "do not require a claimant to set out in detail the facts upon which he bases his claim." Conley, 355 U.S. at 47. Rather, the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)(citations omitted). "'The issue is not whether the plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" Id. at 511, quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). "To that end, the complaint is construed liberally in the plaintiffs' favor, and we grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)(citations omitted).

This is particularly so, as the D.C. Circuit has importantly recognized, and despite the fact that the certification "constitute[s] *prima facie* evidence," <u>Kimbro</u>, 30 F.3d at 1509, "because the plaintiff cannot discharge this burden without some opportunity for discovery". <u>Stokes</u>, 327 F.3d at 1214. In fact, the D.C. Circuit has gone even further: "[i]f there is a material dispute as to the scope issue … the district court must resolve it at an evidentiary hearing." <u>Kimbro</u>, 30 F.3d at 1509.

The most recent case within this Circuit to have addressed the issue of congressional immunity under the Westfall Act, and with facts laced with similarity to this case, first permitted limited discovery prior to ruling on the issue of substitution. <u>Council on American Islamic Relations</u>, 444 F.3d at 663. Discovery occurred even in light of the filing of an affidavit by the Congressman-defendant himself. Of course, in the instant matter, Mr. Murtha has effectively thumbed his nose at the *de novo* review authority of this Court and merely submitted a declaration from a former staffer thereby precluding a proper assessment of the scope of employment issue.[13]

In <u>Council on American Islamic Relations</u> Congressman Ballenger rose to the occasion to defend himself and set forth the specific reasons for why, and in what context, he made <u>each and every</u> alleged defamatory statement at issue in that case. 444 F.3d at 665. Mr. Murtha has intentionally avoided doing so. Thus, this Court is respectfully obligated to favorably construe Wuterich's claims that Mr. Murtha's comments purely "intended to serve his own private purpose and interests." Complaint at ¶23.

---

[13] It appears Mr. Murtha has no qualms about using his staff to stand up for him, although at least in response to the filing of this lawsuit he was willing to issue a prepared statement where he commented: "I don't blame the staff sergeant for lashing out. When I spoke up about Haditha, my intention was to draw attention to the horrendous pressure put on our troops in Iraq and to the cover-up of the incident." "Republican Iraq critic Murtha under fire on two fronts," *Philadelphia Inquirer*, Aug. 3, 2006, attached at Exhibit "1". Apparently it is more important to Mr. Murtha to further his private interests in responses to the media rather than explain himself to this Court.

Notwithstanding the liberal construction of D.C. law with respect to scope of employment, if Mr. Murtha undertook to comment upon Wuterich for his own personal gain outside of his role as a representative for his constituents, it would remove the cloak of immunity. This is a question of fact that requires further development. See Council on American Islamic Relations, 444 F.3d at 665 (both District Court and Court of Appeals rendered factual determination regarding motivation underlying congressman's conduct).[14] There is no "clear nexus" absent the allowance of limited discovery that can yet tie Mr. Murtha's defamatory comments about Wuterich to his ability to "carry out his representative responsibilities effectively." Id. at 665-666. Some of the questions that require elaboration include what steps did Mr. Murtha take to initiate media interviews where he defamed Wuterich, and where and when did all of the interviews that defamed Wuterich take place?[15]

For example, and this is but just one, Mr. Murtha also appeared on ABC's *This Week with George Stephanopoulos* on May 28, 2006, and apparently stated:

> What happened, it was an IED went off. ... It killed one Marine. And then a taxi drives up. When the taxi comes up, there's four or five people in it. And they shoot those four or five people, unarmed. And then, they go on a rampage throughout the houses and kill people. One woman, as I understand it, in talking to the officials in the Marine Corps, was

---

[14] Mr. Murtha made it quite clear months before the Democrats regained power in the House of Representatives (and when victory was not at all ensured) following the November 2006 elections that he was using his Iraq War stance as a means by which to propel his own personal interests and assume the role of Majority Leader (a position his Democratic colleagues ultimately rejected him for). See "Murtha, foe of Iraq War, feels vindicated," *Miami Herald*, Aug. 20, 2006 ("Murtha said he was too old to consider running for president, but that he would try to become majority leader if Democrats gain the 15 seats they need to take charge of the House.").

[15] Mr. Murtha conveniently only submits into evidence his work schedules for May 19, 2006, and May 30, 2006. Def's Memo at Exhibit "7". But he spoke to other members of the press on-air (and had comments foreseeably republished through third parties), and perhaps non-members of the media that we do not know about, that have not been addressed by the Government's Motion, and which should be the subject of limited discovery.

21

> bending over a child, pleading for mercy, and they shot her in cold
> blood. That's the thing that's so disturbing. And even more disturbing is
> the fact that we know the Iraqis knew about it, because they made
> payments to the Iraqis for accidental deaths or for salacious deaths,
> whatever you want to call it. And then in addition to that, there has to
> have been a cover-up of this thing.

Where else did Mr. Murtha appear to convey further falsehoods, such as above, that this Court has not been informed of thereby negating its ability to render a true *de novo* independent review?[16] See Operation Rescue National, 975 F.Supp. at 98 (Senator ordered to provide plaintiffs with any videotapes it had of the fundraising event and subsequent press conference at which the allegedly defamatory remarks were made; plaintiffs then permitted to file a further "evidentiary memorandum" in support of motion to vacate the scope of employment certification).

Additionally, nowhere within any of the declarations or his supporting arguments does Mr. Murtha discuss why he should not be held liable for third parties (particularly within the media and on the Internet) repeating his allegations. This district has expressly recognized that individuals are liable for the republication of defamatory information by third parties. Oparaugo v. Watts, 884 A.2d 63, 73 (D.C. 2003); Tavoulareas v. Piro, 759 F.2d 90, 136 (1985), cert. denied, 484 U.S. 870 (1987)(citations omitted). See also Blue Ridge Bank v. Veribanc, Inc., 866 F .2d 681, 689 (4th Cir.1989)(originator of defamation liable for republication or repetition by third persons, provided natural and probable consequence of act, or presumptively or actually authorized or directed republication); Hickey v. St. Martin's Press, Inc., 978 F. Supp. 230 (D.Md. 1997)(noting

---

[16] The D.C. Circuit noted in Stokes that a plaintiff challenging the Government's scope-of-employment certification "need only have alleged sufficient facts that, taken as true, would establish that the defendants' actions exceeded the scope of their employment." 327 F.3d at 1215. A plaintiff is not "required to allege the existence of evidence he might obtain through discovery....He was merely required to plead sufficient facts that, if true, would rebut the certification." Id. (citation omitted). See also Koch, 209 F. Supp. 2d 89, 92 (D.D.C.)(2002)("The question for resolution by this Court is whether plaintiff . . . would ever be able to produce competent evidence proving that [employee] was *not* acting within the scope of his employment").

State of Maryland would recognize third-party republication liability); Smolla, LAW OF DEFAMATION, § 4:91 ("Liability for republication by another exists if it is 'reasonably forseeable' or 'a natural and probable consequence of the originator's actions.").

Whether Mr. Murtha will ultimately prevail on his effort to have the Government stand in his shoes is not yet the issue. There are legitimate factual gaps that preclude the scope-of-employment determination at this time, and Wuterich should have a fair and reasonable opportunity to demonstrate that Mr. Murtha acted outside of his scope of employment when he not only accused him of being a mass murderer, but tried and convicted him in a public arena (and potentially tainted his upcoming military court proceedings).

## <u>CONCLUSION</u>

Based on the foregoing, Wuterich respectfully requests that Mr. Murtha's/U.S. Government's Motion be denied, without prejudice, and discovery permitted to challenge the scope-of-employment certification.

Date:   June 8, 2007

Respectfully submitted,


/s/

_____
Mark S. Zaid, Esq.
Mark S. Zaid, P.C.
1250 Connecticut Avenue, N.W.
Suite 200
Washington, D.C.  20036
(202) 454-2809
ZaidMS@aol.com

ATTORNEY FOR PLAINTIFF