## INVESTIGATING OFFICER'S REPORT
*(Of Charges Under Article 32, UCMJ and R.C.M. 405, Manual for Courts-Martial)*

| 1a. **FROM:** *(Name of Investigating Officer - Last, First, MI)*<br><br>Ware, Paul J. | b. **GRADE**<br><br>LtCol | c. **ORGANIZATION**<br><br>Navy-Marine Corps Trial Judiciary, WESTPAC Circuit | d. **DATE OF REPORT**<br><br>6 Jul 07 |
|---|---|---|---|

| 2a. **TO:** *(Name of Officer who directed the investigation - Last, First, MI)*<br><br>Mattis, James T. | b. **TITLE**<br><br>Commanding General | c. **ORGANIZATION**<br><br>I Marine Expeditionary Force |
|---|---|---|

| 3a. **NAME OF ACCUSED** *(Last, First, MI)*<br><br>Sharratt, Justin L. | b. **GRADE**<br><br>LCpl | c. **SSN**<br><br>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 | d. **ORGANIZATION**<br><br>HqCo, 1st MAR, 1st MarDiv | e. **DATE OF CHARGES**<br><br>21 Dec 2006 |
|---|---|---|---|---|

| | *(Check appropriate answer)* | YES | NO |
|---|---|---|---|
| 4. | IN ACCORDANCE WITH ARTICLE 32, UCMJ, AND R.C.M. 405, MANUAL FOR COURTS-MARTIAL, I HAVE INVESTIGATED THE CHARGES APPENDED HERETO (Exhibit 1) | x | |
| 5. | THE ACCUSED WAS REPRESENTED BY COUNSEL (If not, see 9 below) | x | |
| 6. | COUNSEL WHO REPRESENTED THE ACCUSED WAS QUALIFIED UNDER R.C.M. 405(d) (2), 502(d) | x | |

| 7a. **NAME OF DEFENSE COUNSEL** *(Last, First, MI)*<br>Cosgrove, Brian G. | b. **GRADE**<br>LtCol | 8a. **NAME OF ASSISTANT DEFENSE COUNSEL** *(If any)*<br>Myers, Gary | b. **GRADE**<br>N/A |
|---|---|---|---|
| c. **ORGANIZATION** *(If appropriate)*<br>1st MLG, CLR-17, LSSS-C (Defense) | | c. **ORGANIZATION** *(If appropriate)*<br>Gary Myers & Associates | |
| d. **ADDRESS** *(If appropriate)*<br>Bldg 22163, Box 555607, Camp Pendleton, CA 92055 | | d. **ADDRESS** *(If appropriate)*<br>78 Clark Mill Rd, Weare, NH 03281 | |

9. *(To be signed by accused if accused waives counsel. If accused does not sign, investigating officer will explain in detail in Item 21.)*

| a. PLACE | b. DATE |
|---|---|

I HAVE BEEN INFORMED OF MY RIGHT TO BE REPRESENTED IN THIS INVESTIGATION BY COUNSEL, INCLUDING MY RIGHT TO CIVILIAN OR MILITARY COUNSEL OF MY CHOICE IF REASONABLY AVAILABLE. I WAIVE MY RIGHT TO COUNSEL IN THIS INVESTIGATION.

c. SIGNATURE OF ACCUSED

| 10. AT THE BEGINNING OF THE INVESTIGATION I INFORMED THE ACCUSED OF: *(Check appropriate answer)* | YES | NO |
|---|---|---|
| a. THE CHARGE(S) UNDER INVESTIGATION | x | |
| b. THE IDENTITY OF THE ACCUSER | x | |
| c. THE RIGHT AGAINST SELF-INCRIMINATION UNDER ARTICLE 31 | x | |
| d. THE PURPOSE OF THE INVESTIGATION | x | |
| e. THE RIGHT TO BE PRESENT THROUGHOUT THE TAKING OF EVIDENCE | x | |
| f. THE WITNESSES AND OTHER EVIDENCE KNOWN TO ME WHICH I EXPECTED TO PRESENT | x | |
| g. THE RIGHT TO CROSS-EXAMINE WITNESSES | x | |
| h. THE RIGHT TO HAVE AVAILABLE WITNESSES AND EVIDENCE PRESENTED | x | |
| i. THE RIGHT TO PRESENT ANYTHING IN DEFENSE, EXTENUATION, OR MITIGATION | x | |
| j. THE RIGHT TO MAKE A SWORN OR UNSWORN STATEMENT, ORALLY OR IN WRITING | x | |
| 11a. THE ACCUSED AND ACCUSED'S COUNSEL WERE PRESENT THROUGHOUT THE PRESENTATION OF EVIDENCE *(If the accused or counsel were absent during any part of the presentation of evidence, complete b below.)* | | x |

b. STATE THE CIRCUMSTANCES AND DESCRIBE THE PROCEEDINGS CONDUCTED IN THE ABSENCE OF ACCUSED OR COUNSEL

Mr. Culp was absent, with the consent of the accused, for a short time during one session of the hearing. Mr. Myers and LtCol Cosgrove were present for all sessions.

**NOTE:** If additional space is required for any item, enter the additional material in Item 21 or on a separate sheet. Identify such material with the proper numerical and, if appropriate, lettered heading *(Example: "7c".)* Securely attach any additional sheets to the form and add a note in the appropriate item of the form: "See additional sheet."

**DD Form 457, AUG 84 (EG)**          EDITION OF OCT 69 IS OBSOLETE.          Designed using Perform Pro, WHS/DIOR, Oct 94

| 12a. THE FOLLOWING WITNESSES TESTIFIED UNDER OATH: *(Check appropriate answer)* | | | | |
|---|---|---|---|---|
| NAME *(Last, First, MI)* | GRADE *(If any)* | ORGANIZATION/ADDRESS *(Whichever is appropriate)* | YES | NO |
| See attached witness list. | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| b. THE SUBSTANCE OF THE TESTIMONY OF THESE WITNESSES HAS BEEN REDUCED TO WRITING AND IS ATTACHED. | x | |
|---|---|---|

| 13a. THE FOLLOWING STATEMENTS, DOCUMENTS, OR MATTERS WERE CONSIDERED; THE ACCUSED WAS PERMITTED TO EXAMINE EACH. | | | |
|---|---|---|---|
| DESCRIPTION OF ITEM | | LOCATION OF ORIGINAL *(If not attached)* | |
| See attached exhibit list. | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| b. EACH ITEM CONSIDERED, OR A COPY OR RECITAL OF THE SUBSTANCE OR NATURE THEREOF, IS ATTACHED | x | |
|---|---|---|
| 14. THERE ARE GROUNDS TO BELIEVE THAT THE ACCUSED WAS NOT MENTALLY RESPONSIBLE FOR THE OFFENSE(S) OR NOT COMPETENT TO PARTICIPATE IN THE DEFENSE. *(See R.C.M. 909, 916(k).)* | | x |
| 15. THE DEFENSE DID REQUEST OBJECTIONS TO BE NOTED IN THIS REPORT *(If Yes, specify in Item 21 below.)* | | x |
| 16. ALL ESSENTIAL WITNESSES WILL BE AVAILABLE IN THE EVENT OF TRIAL | | x |
| 17. THE CHARGES AND SPECIFICATIONS ARE IN PROPER FORM | x | |
| 18. REASONABLE GROUNDS EXIST TO BELIEVE THAT THE ACCUSED COMMITTED THE OFFENSE(S) ALLEGED | | x |
| 19. I AM NOT AWARE OF ANY GROUNDS WHICH WOULD DISQUALIFY ME FROM ACTING AS INVESTIGATING OFFICER. *(See R.C.M. 405(d) (1).* | x | |

20. I RECOMMEND:
a. TRIAL BY  ☐ SUMMARY          ☐ SPECIAL          ☐ GENERAL COURT-MARTIAL
b. ☒ OTHER *(Specify in Item 21 below)*

21. REMARKS *(Include, as necessary, explanation for any delays in the investigation, and explanation for any "no" answers above.)*

14. Neither counsel presented evidence or indicated the accused was not mentally responsible. Additionally, my observations and interaction with accused satisfied me that he was mentally competent to participate in the defense.

15. No written objections were filed although the defense did object to my consideration of the interviews of 4 Iraqi witnesses claiming the statements were not under oath. See attached pages for discussion of this objection.

16. Government counsel represented that key Iraqi witnesses are willing to cooperate but was unsure if such cooperation included traveling to the United States to testify at a Courts-martial.

18. Please see attached sheets with analysis.

20. I recommend dismissal of the Charge and Specifications without prejudice.

| 22a. TYPED NAME OF INVESTIGATING OFFICER | b. GRADE | c. ORGANIZATION |
|---|---|---|
| Paul J. Ware | LtCol | Navy-Marine Corps Trial Judiciary, Western Pacific Judicial Circuit |
| d. SIGNATURE OF INVESTIGATING OFFICER | | e. DATE 6 Jul 07 |

**DD Form 457 Reverse, AUG 84**

12a  The following witnesses testified under oath:

| Name | Organization/address |
|------|----------------------|
| SSgt Justin Laughner, USMC | CLR 17 Svc Co |
| Dr. Barak A. Salmoni | CAOCL MCTEC, Quantico, VA |
| Mr. Amir Alkaysey | Corona, New York |
| Special Agent Nayda M. Mannle* | NCIS, Washington DC |
| LCpl James, Prentice, USMC * | 13th MEU |
| LtCol David G. Bolgiano, USAFR | COIC, Pentagon, Washington DC |
| Major Dana Hyatt, USMCR* | New Haven, CT |
| LtCol Elizabeth Rouse, USAFR | Bethesda, MD |
| Special Agent Michael S. Maloney | NCIS, Okinawa, Japan |
| Special Agent Mark Cranfill | NCIS, Washington DC |
| Special Agent Mark Platt | NCIS, Washington DC |
| Cpl Robert Stafford, USMC | MCRD, Paris Island, SC |
| Mr. Francis Wolf III* | Crestwood, KY |
| Mr. Trent Aaron Gravis* | Fairdale, KY |

*These witnesses testified via telephone.

A verbatim transcript of the testimony is included with this report.

13a  The following statements, documents or matters were considered; the accused was permitted to examine each.  Other than noted in paragraph 21, there were no objections to any of the documents by either party.

| Exhibit number | Description |
| --- | --- |
| 1 | Charge Sheet & Appointing Order |
| 2 | Email of James D. Culp, Esq . dtd 19 Feb 2007 |
| 3 | Email of Col Chester dtd 20 Feb 07 |
| 4 | LtCol Sullivan ltr 5800 of 5 Mar 2007 |
| 5 | LtGen Mattis ltr 5800 of 7 Mar 2007 |
| 6 | LtGen Mattis ltr 5811 of 6 April 2007 |
| 7 | Defense witness request dtd 16 February 2007 |
| 8 | Defense witness request dtd 8 March 2007 |
| 9 | Defense witness request dtd 28 March 2007 |
| 10 | Defense witness request dtd 3 April 2007 |
| 11 | Defense witness request dtd 5 April 2007 |
| 12 | Defense witness request dtd 10 April 2007 |
| 13 | Defense witness request dtd 1 May 2007 |
| 14 | Government 23 March 2007 response to Defense witness request dtd 16 February and 8 March 2007 |
| 15 | Government 30 March 2007 response to Defense witness request dtd 23 March 2007 |
| 16 | Government 5 April 2007 response to Defense witness request dtd 3 April 2007 |
| 17 | Government 19 April 2007 response to Defense witness requests dtd 16 February, 8 March, 28 March, 3 April, 5 April and 10 April 2007 |
| 18 | Government 2 May 2007 response to Defense witness request dtd 1 May 2007 |
| 19 | Defense email withdrawal of request for SgtMaj Kasal as an Article 32 witness dtd 2 May 2007 |
| 20 | Defense discovery request dtd 24 January 2007 |
| 21 | Defense discovery request dtd 16 February 2007 |
| 22 | Defense discovery request dtd 10 April 2007 |
| 23 | Government 23 March 2007 response to defense discovery request dtd 24 January 2007 |
| 24 | Government 23 March 2007 response to defense discovery request dtd 16 February 2007 |
| 25 | Government 19 April 2007 response to defense discovery request dtd 10 April 2007 |
| 26 | PFC Andrew Wright Resp to Req to Testify |
| 27 | Mr. Gardner Resp to Req to Testify |
| 28 | Mr. Grapes Req to Testify ICO Sharratt |
| 29 | Trial Counsel ltr 5800 LSST-C of 7 Mar 07 (SSgt Wuterich Req to Testify) |

| 30 | Email from Maj Faraj dtd 21 Mar 07 (SSgt Wuterich invoking 5th Amen) |
| 31 | Trial Counsel ltr 5800 LSST-C of 7 Mar 07 (LCpl Tatum Req to Testify) |
| 32 | Email from Mr. Zimmerman dtd 30 Mar 07 (LCpl Tatum invoking 5th Amen) |
| 33 | OMPF of LCpl Sharratt |
| 34 | SRB of LCpl Sharratt |
| 35 | Results of Interview of Ehab Ayad Turki dtd 6 Apr 06 (w/ sworn affidavit) |
| 36 | Results of Interview of Nagham Fawaz Suliman Rajas dtd 6 Apr 06 (w/ sworn affidavit) |
| 37 | Statement of Nagham Fawaz Suliman Rajab dtd 23 Jan 07 (w/ sworn affidavit and translator declaration), transcript |
| 38 | Statement of Najla Abid Al Razak dtd 23 Jan 07 (w/ sworn affidavit and translator declaration), transcript |
| 39 | Statement of Khalid Jamal Aayed Hamed 24 Jan 07 (w/ sworn affidavit and translator declaration), transcript |
| 40 | Statement of Ehab Ayad Turki 24 Jan 07 (w/ sworn affidavit and translator declaration), transcript |
| 41 | Video Interviews of Nagham, Najla, Khalid, Ehab |
| 42 | Rights Advisement and Statement of SSgt Wuterich dtd 21 Feb 06 |
| 43 | Rights Advisement and Statement of SSgt Wuterich dtd 18 Mar 06 |
| 44 | Rights Advisement and Statement of LCpl Sharratt dtd 20 Feb 06 |
| 45 | Rights Advisement and Statement of LCpl Sharratt dtd 19 Mar 06 with NCIS SA McDaniel |
| 46 | Rights Advisement and Statement of LCpl Sharratt dtd 24 Mar 06 with NCIS SA Platt & SA Mannle |
| 47 | Rights Advisement and Statement of Cpl Salinas dtd 19 Feb 06 |
| 48 | Rights Advisement and Statement of Cpl Salinas dtd 18 Mar 06 |
| 49 | Rights Advisement and Statement of Cpl Salinas dtd 24 Mar 06 |
| 50 | Results of receipt of 3/1 Captured Weapons Log dtd 1 Jun 06 |
| 51 | Statement of LCpl Prentice dtd 18 Oct 06 |
| 52 | Statement of LCpl Prentice dtd 27 Mar 07 |
| 53 | Deposition transcript for Capt Dinsmore dtd 26 March 07 (redacted version Unclassified) |
| 54 | Deposition transcript and video for Capt Dreger dtd 27 March 07 |

| | |
|---|---|
| 55 | Deposition transcript and video for GySgt Dunlap dtd 29 March 07 |
| 56 | Deposition transcript and video for 2ndLt Kallop dtd 5 May 07 |
| 57 | Pathology Report of House #4 excerpt from 16 Nov ROI |
| 58 | Pre death photos of Jasib Aiad Ahmed (with authentication documents: NCIS 12 Sept 06 ROI, Exhibit 491, Enclosure O) |
| 59 | Pre death photos of Kahtan Aiad Ahmed (NCIS 12 Sept 06 ROI, Exhibit 491, Enclosure P) |
| 60 | Pre death photos of Jamal Aiad Ahmed (NCIS 12 Sept 06 ROI, Exhibit 491, Enclosure Q) |
| 61 | Photo of Jasib Aiad Ahmed, Kahtan Aiad Ahmed and Jamal Aiad Ahmed deceased (with authentication documents: 12 Sept ROI, Exhibit 412, p. 333, photo # 30/31) |
| 62 | Photo of Jasib Aiad Ahmed deceased (12 Sept ROI, Exhibit 412, p. 329, photo # 26/31) |
| 63 | Photo of Kahtan Aiad Ahmed deceased (12 Sept ROI, Exhibit 412, p. 330, photo # 27/31) |
| 64 | Photo of Jamal Aiad Ahmed deceased (12 Sept ROI, Exhibit 412, p. 331, photo # 28/31) |
| 65 | Photo of Marwan Aiad Ahmed deceased (with authentication documents: 12 Sept ROI, Exhibit 412, pp. 332 & 334, photo #s 29/31 & 31/31) |
| 66 | Translation of Death Certificate of Jamal Aiad Ahmed (with authentication documents: 3 Aug 06 NCIS ROI, Exhibit 377, Enclosure EE) |
| 67 | Translation of Death Certificate of Jasib Aiad Ahmed (with authentication documents: 3 Aug 06 NCIS ROI, Exhibit 377, Enclosure GG) |
| 68 | Translation of Death Certificate of Marwan Aiad Ahmed (with authentication documents: 3 Aug 06 NCIS ROI, Exhibit 377, Enclosure II) |
| 69 | Translation of Death Certificate of Kahtan Aiad Ahmed (with authentication documents: 3 Aug 06 NCIS ROI, Exhibit 377, Enclosure KK) |
| 70 | Satellite images of Haditha, Iraqi in the vicinity of route chestnut and viper (Google Earth) |
| 71 | Forensic Report of House #4 excerpt from 16 Nov ROI |
| 72 | Results of Death Scene Investigation from 3 Aug ROI |
| 73 | 71a. Pictures continued from IE 71 |
| 74 | *Curriculum Vitae* of Jennifer M. Coslin |
| 75 | *Curriculum Vitae* of Thomas F. Brady |
| 76 | *Curriculum Vitae* of Ross M. Gardner |
| 77 | *Curriculum Vitae* of Elizabeth A. Rouse |

| | |
|---|---|
| 78 | *Curriculum Vitae* of Patrick D. Ball |
| 79 | *Curriculum Vitae* of Michael S. Maloney |
| 80 | Jennifer Coslin DNA Report |
| 81 | Patrick Ball Ballistics Report |
| 82 | Immunity Request for Sgt Salinas |
| 83 | LCpl Stephen Tatum Invocation Affidavit |
| 84 | Google Earth Satellite Image Map with markings by SSgt Laughner |
| 85 | SSgt Laughner Immunity documents |
| 86 | Sgt Hector Salinas Invocation Affidavit |
| 87 | LCpl James Prentice SRB |
| 88 | SSgt Laughner photos |
| 89 | Barak Salmoni, PhD Curriculum Vitae |
| 90 | Youssef ROI |
| 91 | Audio Clip of House 4 Forensic Examination |
| 92 | LtCol Bolgiano Power Point Slides |
| 93 | HN Brian Whitt |
| 94 | PFC Andrew Wright |
| 95 | Mr. Brian Casidy Statement |
| 96 | LCpl Max Schaal Statement |
| 97 | Google Earth Satellite Image Map with markings by Cpl Stafford |
| 98 | Request for Grant of Testimonial Immunity, RE: Sgt Francis Wolf |
| 99 | SSgt Wuterich Invocation Affidavit |
| 100 | LCpl Gravis Statement dtd 19 February 2006 |
| 101 | LCpl Gravis Statement dtd 19 March 2006 |
| 102 | House 4 Diagram created by Special Agent Maloney |
| 103 | Defense Exhibit Diagram Chart used during Special Agent Maloney Cross Examination, RE: Victim positions |
| 104 | Defense Exhibit Diagram Chart used during Special Agent Maloney Cross Examination, RE: Gunfire direction |
| 105 | Defense Article 32 Summary Binder |
| 106 | Defense Article 32 Large Exhibit Binder (55 enclosures) |
| 107 | Government's Written Closing |

## Summary of facts

On 19 November 2005, LCpl Sharratt fatally shot Jasib Aiad Ahmed, Kahtan Aiad Ahmed and Jamal Aiad Ahmed in the province of Haditha Iraq. LCpl Sharratt engaged each with a M9 service pistol in a back room of a house owned by the Ahmed family. A fourth person, Marwan Aiad Ahmed was fatally shot by SSgt Wuterich after LCpl Sharratt's magazine ran out of rounds. This incident occurred several hours after an IED fatally wounded a Marine and Marines engaged in several firefights and house clearings to the South and East of the Ahmed houses. LCpl Sharratt played a minor role in the assault on houses to the South and spent most of the morning tasked with sector security and focusing his observation to the North.

After the assaults to the South were completed and insurgent activity and firefights had all but ceased, LCpl Sharratt, Cpl Salinas and SSgt Wuterich manned an observation post established by 2ndLt Kallop. While manning the observation post, the Marines talked and smoked cigarettes while keeping a watch for suspicious activity. The Marines noticed several men peeking over a privacy wall at the Ahmed houses. The Marines suspected that the men might be forward observers for another assault or IED attack. Cpl Dela Cruz fired a "training round" at the men to get them to move. The men initially withdrew but then returned to the wall. SSgt Wuterich then took a team of Marines to investigate. Cpl Salinas, LCpl Sharratt and SSgt Wuterich approached the house where the men were last seen. Unknown to the Marines at the time was that the house was actually two houses separated by a very small alley. Inside the first house the Marines encountered several women.

It is at this point that the evidence presents two different versions of events. For simplicity, I will call the Iraqi witnesses' version the government version and LCpl Sharratt's account as the defense version. Common to both versions are the following facts: Four men identified in the first paragraph were killed inside Ahmed's house referred to in the investigation as house four (4); all four were killed inside the same room within house 4; two (2) AK-47's were seized by Marines and removed from the Ahmed's possession; and a suitcase with clothing was removed from house 4 by Marines.

The government version alleges that the Marines ordered all the people out of both houses 3 and 4 and asked if they were insurgents and whether they had weapons inside. The Iraqis responded that they had an AK-47 inside each house. A Marine then escorted one couple inside house 3 and retrieved one AK-47. A second Marine then escorted another into house 4 and retrieved the second AK-47. The Iraqis were then ordered into one group with the men standing and the women sitting behind them with an infant and a teenage boy. After two Marines held a private conversation away from the group, the Marines returned and ordered the Iraqis to separate into two groups, women and child in one group and men in another. The teenage boy was initially with the group of men but then switched to the group with women and the child. The group with women was then ordered at gunpoint into house 3 while the men were ordered inside house 4. While inside house 3 the women attempted to open the door but a Marine kept closing the door and yelling at them to stay inside. A short time later, the Iraqis heard gunshots, 4 shots

separated by a few seconds. The women tried to leave house 3 but the Marine forced the door shut and smashed the window while yelling at them. The Marines exited house 4, began laughing then the third Marine joined them and they left. The women found the 4 bodies inside house 4.

The defense version contends that the Marines approached house 3 and found only women and children inside. They asked where the men were and then discovered that there were two houses within the courtyard. Cpl Salinas stayed with the women and children in house 3 while SSgt Wuterich and LCpl Sharratt went to search house 4. They found the door open and without announcing their presence, entered the house in a tactical stacked formation. They moved along the walls to the middle of the house by the stairs leading to the roof. LCpl Sharratt then saw a man standing in a doorway with an AK-47 in his hands and pointing the weapon at LCpl Sharratt. LCpl Sharratt attempted to fire his SAW but it jammed. He dropped the SAW and pulling back behind the wall he retrieved his 9mm pistol. He then peered around the wall and saw the same man returning to the doorway holding an AK-47 and shot him. Hitting the man with at least one shot, he noticed a second man behind the door bending over and retrieving the AK-47. LCpl Sharratt moved swiftly toward the door firing his pistol at the second man. Once inside the doorway LCpl Sharratt began firing his pistol from right to left. There were two more men inside the room on the far left side of the room from the doorway. LCpl Sharratt emptied his magazine firing at least 11 rounds fatally shooting the third man inside the room. The fourth man moved from the left toward the wall locker (closet) as LCpl Sharratt yelled that his weapon was empty. SSgt Wuterich then moved forward and fired his M16 weapon at the wall locker fatally killing Marwan. SSgt Wuterich then shot each of the other three men several times to ensure they were all dead.

LCpl Sharratt retrieved one AK-47 and found a suitcase on a couch in the room closest to the door. They exited house 4 and met up with Cpl Salinas. Cpl Salinas or SSgt Wuterich found another AK-47 and both AK-47s and suitcase were handed over to another Marine with no accountability of the items. The suitcase contained clothing and 3 or 4 passports which were believed to be Jordanian.

It is clear that these accounts are radically different, the government version describing a deliberate execution and LCpl Sharratt's account describing a lawful use of deadly force in either a combat situation or a clearly perceived threat of hostile intent on the part of the Iraqi men. If the government version is true, a charge of premeditated murder with 4 specifications is warranted. If the defense version of events is true, dismissal of the charge is justified.

## Analysis of evidence

The elements of the charged offense of Article 118(2) are:

      (a) That a certain named or described person is
          dead;
      (b) That the death resulted from the act or omission of the accused;
      (c) That the killing was unlawful; and
      (d) That, at the time of the killing, the accused had the intent to kill or
          inflict great bodily harm upon a person.

The elements of premeditated murder, Article 118(1) are:

      (a) That certain named or described person is
          dead;
      (b) That the death resulted from the act or omission of the accused;
      (c) That the killing was unlawful; and
      (d) That, at the time of the killing, the accused had a premeditated design
          to kill.

The evidence presented at the Article 32 satisfies the first two elements for either Article 118(1) or Article 118 (2), that 3 persons are dead and that the accused caused the deaths. Furthermore, it is clear from the evidence that the 4th element of Article 118 (2) is satisfied. Counsel for both sides readily conceded that the killings were intentional. The crux of this case centers on the question of whether the government has sufficient evidence to support a finding that there are reasonable grounds to believe that the killings were unlawful and if unlawful, whether they were done with premeditation, the third elements for both Article 118(1) and Article 118 (2) and the 4th element of Article 118(1).

A reasonable ground is commonly argued as being similar to probable cause. The test is whether there is more evidence for than against. Another commonly used test is a _set of circumstances which would satisfy an ordinary, cautious and prudent person, that there is reason to believe an offense has been committed._ Reasonable grounds must be more than suspicion or the ability to theorize a criminal act from a set of facts excluding all evidence to the contrary. Inherent in this responsibility is the need to determine the credibility of the witnesses and the evidence. Although the government does not present all its evidence at the Article 32 hearing and that the burden certainly is much less than beyond a reasonable doubt, government counsel must still present credible evidence to support the conclusion that reasonable grounds exist to believe that a crime was committed.

Although the government presented a compelling theory tying-in the events and actions by other Marines as a prelude for the actions of LCpl Sharratt in house 4, the

information was not particularly relevant to the case at hand and I limited its use to background information.

In support of its theory, and to satisfy reasonable grounds with regard to the two contested elements, the government offered 4 Iraqi witness interviews, testimony of NCIS agents and statements of LCpl Prentice, Mr. Gravis, Mr. Casiday, LCpl Schaal and PFC Wright.

## Evidence offered to support reasonable grounds

I find that the Iraqi witnesses' statements are unsupported by scientific evidence and are incredible for the following reasons:

1. Evidence not Consistent with an Execution.   Without question, the forensic evidence demonstrates that three of the men were shot in the head while facing forward from a distance of at least 2 feet. The three men in the specifications of the Charge all suffered fatal head wounds consistent with 9mm rounds fired from a distance beyond 2 feet. It is difficult, if not impossible to believe, that trained and experienced Marines would decide to execute 4 unarmed men by leading them into a house, moving them to the a back room with no light (curtains were closed) and allow them to move about the room while trying to shoot them with the least effective weapon in their arsenal. In addition, forensic evidence proves that one person was standing in the doorway and shot to the face while the other three men were further inside the room. Under such circumstances one would reasonably expect that the others would then attempt to run or fight. None of the victims received defensive wounds to their hands or arms nor did they receive wounds to their backs or rear of their heads. Each was shot facing forward, from a distance, and with a 9mm pistol which I find inconsistent with an execution or persons reacting to an execution. Furthermore, there is no evidence to suggest LCpl Sharratt attempted to hide the fact that he shot these individuals. To the contrary, SSgt Laughner testified that he was aware that people were shot in house 4 due to reports from the field.

2. Witness Accounts are not Credible.  The Iraqis' first statements to NCIS were taken in a group setting, five months after the events occurred and with knowledge that other families in Haditha had received monetary compensation from the United States for events that occurred on 19 November 2005. The interview that resulted in the witness statements were taken by Special Agent Mannle in a group setting, with each witness adding details and discussing the events in Arabic with one another in front of Special Agent Mannle who does not speak Arabic. Additionally, although $10,000 does not appear to be a large amount of money, testimony from Maj Hiatt suggested that such a sum of money was equal to 4 times the average annual salary of a typical resident of Haditha. Prior to making these claims, no payments were made to the Ahmed family. The Ahmed family was represented by an attorney who represents other families who received compensation for Marines killing their family members. Shortly after making these claims, the Ahmed family was paid $10,000 in Solatia payments.

3. <u>Timeliness of Interviews</u>. The interviews of Khalid, Nagham, Nagla and Ehab by Maj Erickson were conducted almost a year later in January 2007. These witnesses were placed under oath, although the form of the oath was translated in three different manners, the witnesses were not subject to American law of perjury and testimony by Dr. Salmoni suggested that cultural and religious beliefs in Iraqi suggests that these statements would not be considered under oath in an Iraqi court. In addition, Dr. Salmoni opined that women and children statements are considered inheritably less reliable than a man's statement in Iraqi law. Although such discrimination is not recognized in our society, the fact that these Iraqis have this cultural understanding suggests that they would believe United States authorities would likewise view their statements as less reliable and may suggest they would feel less need to be fully truthful. Finally, each witness was accompanied by the attorney who represented the family for Solatia payments, and the interviews were conducted in Arabic through a translator and Maj Erickson could not understand the Arabic conversations, relying on translation and in parts, interpretation by Mr. Alkaysey.

The statements made in Jan 2007 are contradictory to each other in parts. Some of the key contradictions are:

Khalid states that the Marine with a pistol guarded them and did not go into house number 4 (see pages 6-8 of IE 39). He also describes the Marine who guarded him and the women in house 3 as having a weapon on a tripod (SAW) and that he heard only 4 shots separated by a few seconds. He describes the men who left house 4 both had AK-47's slung on their shoulders. He later claims that the men also had pistols in their holsters but only after several prompting questions by Maj Erickson. Ultimately, he could not identify where the pistols were, but concluded that all the "men" had pistols. *LCpl Sharratt had a SAW and pistol, SSgt Wuterich and Cpl Salinas had M16s only. Khalid's description suggests that LCpl Sharratt was the one guarding them at house 3 and that can not be factually supported. Khalid's account of seeing 2 AK-47s begin removed from house 4 further supports LCpl Sharratt's account that two of the Iraqi men had AK-47s when he shot them.*

Nagham states that the Marine with the pistol was in charge giving orders to the other two (see page 11of IE 37). She also says that no one moved the bodies before the Marines arrived to take photographs. Finally, she stated that they were planning on taking a trip to Baghdad later that day and that is why Kahtan's suitcase was packed with clothes and a shaving kit (see page 15 of IE 37). *It is highly unlikely that two senior Marines, SSgt Wuterich and Cpl Salinas would defer in authority to LCpl Sharratt and allow him to issues orders to themselves and the Iraqis. Because we know that only LCpl Sharratt had a pistol, her account that the one with the pistol was in charge appears to be factually false. Forensic evidence clearly proves that the bodies must have been moved from the location where they fell to where they were covered with sheets and later photographed. Finally, it is incredible to believe the family was traveling to Baghdad that day if only Kahtan was packed and ready for the trip.*

Nagla states that the man with the pistol was in charge telling the other Marines what to do (see page 7 of IE 38). *Again we see the theme that the "one with the pistol" was the person in charge. Clearly by now, these witnesses know that their loved ones were killed with 9mm rounds from a pistol and that LCpl Sharratt is the one accused. To facilitate a story of execution, placing LCpl Sharratt in charge would make the story more plausible except for the fact it is incredible to believe that two senior Marines would subjugate themselves to a LCpl under these conditions.*

Ehab states that Kahtan was about to travel to Trabeed (ph) and that she assisted in packing his suitcase so she knew what was inside it (see page 8 of IE 40). This contradicts Nagham who said the "family" was traveling to Baghdad. Again she reiterates that the "one with the pistol was in charge" (see page 6 of IE 10).

There are other inconsistencies between the four statements and with the "group statement" to NCIS. NCIS was unable or chose not to conduct further research into the following significant issues:

Whether Kahtan was employed on the Jordan border as claimed by the Iraqi witnesses?

Whether Marwan was an engineer at the Haditha dam and had a properly issued CAG card? The Iraqi witnesses claimed Marwan tried to show this card to the Marines but the Marines were uninterested. NCIS investigation revealed no CAG card was ever issued to Marwan and NCIS did not follow up on whether Marwan was employed at the dam.

Whether Jasib was a traffic officer? There was no uniform found at house 4 and there was no formal recognized police force in Haditha in November 2005.

Whether Jamal was a local businessman? No NCIS follow up to determine if he was a businessman and if so, what business he was involved in.

Not following up on these claims supports the defense contention that NCIS did not critically examine the credibility of these witnesses during its investigations. If these claims are untrue, then the credibility of these witnesses is further eroded.

Finally, the family's unwillingness to allow NCIS to exhume bodies and conduct an autopsy prevents the defense from discovering exculpatory evidence. Failure to examine the bodies does not in itself raise reasonable doubt, but coupled with inconsistencies in

statements and apparent fabrications in the Iraqi witness statements the government's version is seriously deficient. Furthermore, the Ahmed family stated to Special Agent Mannle that they would rather forgive the Americans than allow the bodies to be exhumed and examined.

4.  Government evidence of confessions or admissions:    The government further offers statements of Marines to support its version of facts. LCpl Prentice testified under oath that he did not tell NCIS that LCpl Sharratt "made up" a story, only that LCpl Sharratt had a story. The practice of NCIS agents typing up complete statements then having a witness review can often lead to Special Agents "assisting" with language and coloring the intent of the witnesses. Regardless of which version is true, LCpl Prentice is now on record as providing two contradictory sworn statements.

Mr. Gravis' testimony was offered primarily to set the stage for the events in house 4 with emphasis on whether shots were fired from the South. The events to the South had little to no relevance to this investigation. Mr. Gravis testified that LCpl Sharratt said he lied to NCIS. It is unclear whether this conversation between Mr. Gravis and LCpl Sharratt was an admission that LCpl Sharratt lied about the events in house 4, things he witnessed earlier in the day, random non-essential information or whether this was simply LCpl Sharratt bragging and or exaggerating the truth. (see IE 98).

The government provided a sworn statement of Mr. Casiday with graphic stories which simply can not be supported in facts. The statement tells of prisoners beaten by LCpl Sharratt, evidence being planted by 2ndLt Kallop, LCpl Sharratt executing people that were in a white vehicle along with bravado concerning the role of infantry Marines in Iraq. His statement exudes exaggeration and immaturity. I find the statement wholly incredible and not particularly relevant.

The government offered the sworn statement of PFC Wright alleging LCpl Sharratt said they assaulted the Iraqis "punisher style." Although unfamiliar with the movie from which this term originates, PFC Wright places the comment into context stating that is just the way LCpl Sharratt talks "thinking nothing" about it. IE 92. PFC Wright's statement is not particularly relevant.

LCpl Schaal's sworn statement was also offered to demonstrate that LCpl Sharratt was out for vengeance. The statement, however, is full of incredible stories and contains not one sentence directly relating to LCpl Sharratt and house 4 in IE 94. Instead, I read much of the same, exaggerated tales of killing by Marines even though LCpl Sharratt was not an active participant on the assaults on the houses to the South.

The defense provided a sworn statement by HN Whitt to support its claim that LCpl Sharratt has a habit of exaggerating, and telling "war stories" along with an immaturity or ability to handle with solemnity the act of killing another human. The defense portrays these statements as "gallows humor", exaggeration, and youthful lies as a result of LCpl Sharratt's desire to exaggerate his actions to heroic levels. It also suggests a difficulty or immaturity in coping with killing humans. A common coping mechanism with dealing

with stress or fear is to use humor, however distasteful, to make one sound immune to the human emotions of caring, fear and despair over killing others.

None of the statements offered comes close to being a confession or admission that the actions of LCpl Sharratt on 19 November 2005 were criminal. Although I suspect LCpl Sharratt has not been entirely truthful concerning all the events on 19 November 2005, the statements submitted by the government are rife with rumors, hearsay within hearsay, and unclear, confusing and often inadmissible opinions.

## Evidence offered against reasonable grounds

In contrast, LCpl Sharratt's version of events is fully supported by the independent scientific evidence. NCIS agent Maloney described the account of LCpl Sharratt as "not fully supported or contradicted." By that he meant that he could not determine if two of the individuals were moving toward LCpl Sharratt when he fired his weapon, that he could not conclude if the victims had weapons on them before being shot and that he was unsure of the position of the number 3 victim when he received his fatal wounds. Upon further examination, Special Agent Maloney conceded that LCpl Sharratt's account of what occurred is the most reasonable and plausible explanation supported by the forensics. Although science will never be able to remove all doubts, with a high degree of certainty, the science supports the statements of LCpl Sharratt as the most plausible, possible and most likely.

## Recommended changes to Charge

The government's theory of liability rests upon the government version that the men were ordered into house 4 and subsequently shot and killed. The Charge and specifications allege "intent to kill or inflict great bodily harm". Assuming the facts as alleged by the Iraqi witnesses are completely true, the Charge should be premeditated murder. There is no intervening act to suggest a different theory. The Iraqi witnesses describe a conversation between two Marines, a plan to separate the women and men, then a series of gunshots and 4 Iraqi men dead. If true, clearly there is premeditation. The intent to kill was formed when bringing the men into house 4 or shortly thereafter. The premeditation does not need to be for any specific length of time, and under these "facts", a charge of premeditated murder is appropriate. Again, using only the government version as fact, LCpl Sharratt is equally guilty of murder of Marwan under conspiracy, aiding and abetting or accessory after the fact theories of principal liability. Thus, notwithstanding my belief that the government version is unsupported and incredible, if continuing to trial I recommend the following changes to the specifications and an additional specification be made, preferred and referred to trial as non capital offenses:

I recommend **deleting** the language "*intent to kill or inflict great bodily harm*" **substituting** the word "*premeditation*" **deleting** the words "*identified as Number 21 and believed to be*" **substituting** the word "*Mr.*" and further **deleting** the words "*with a M9 service pistol*" from specification 1.

I recommend **deleting** the language "*intent to kill or inflict great bodily harm*" **substituting** the word "*premeditation*" **deleting** the words "*identified as Number 22 and believed to be*" **substituting** the word "*Mr.*" and further **deleting** the words "*with a M9 service pistol*" from specification 2.

I recommend **deleting** the language "*intent to kill or inflict great bodily harm*" **substituting** the word "*premeditation*" **deleting** the words "*identified as Number 23 and believed to be*" **substituting** the word "*Mr.*" and further **deleting** the words "*with a M9 service pistol*" from specification 3.

**Specification 4:  In that Lance Corporal Justin L. Sharratt, U.S. Marine Corps, on active duty, did, at or near Haditha, Iraq, on or about 19 November 2005, with premeditation, murder Mr. Marwan Aaid Ahmed, by shooting him.**

## Legal Issues

All witnesses that testified at the Article 32 indicated no problems with availability for trial.

Khalid, Nagham, Nagla, and Ehab indicated to government counsel they would cooperate, but the extent of their cooperation to include whether they would travel to the United States and testify at a court-martial has not yet been determined.  These witnesses have indicated a willingness to testify at a trial in Iraq.  If these witnesses were called to testify at trial, steps to incorporate Iraqi procedures for oaths to include reference to Allah and the Koran should be reviewed in order to ensure such testimony is under an oath which is substantially similar in its application to cause the witness moral and legal pressure to testify truthfully.

The defense asked for comment on a doctrine they call "qualified combat immunity" based on the United States Supreme Court cases Graham v Connor 490 U.S. 386 (1989) and Saucier v Katz 533 U.S. 194 (2001).  Although such a motion may be ripe for litigation in a court of law, the proposed doctrine is not applicable to my analysis of the evidence.  Furthermore, such comment by a military judge currently assigned to hear cases would, in my opinion, constitute an advisory opinion.  As such, I am declining the request, although the defense analysis of the cases and position for consideration begins on page 55 of IE 104.

## Recommended disposition of Charge

Due to the disparate accounts, it is tempting to simply conclude that this case should be tried to either exonerate LCpl Sharratt or convict him of a crime.  However, to adopt the government's position that because there are two differing accounts, a general court-martial is warranted is an abdication of the necessary process of determining whether reasonable grounds exist to warrant a court-martial.  It is not as simple as stating there are two accounts so a trial is necessary.  Analysis of these two versions must provide reasonable grounds that the Government version of events may be true.  In analyzing the evidence, I read several hundred pages of interviews, documents, articles and statements (IE 33-105).  Ultimately, there is only one statement by an eye witness to the events, LCpl Sharratt, and his version of events is strongly corroborated by independent forensic analysis of the death scene.  The government version is unsupported by independent evidence and while each statement has within it corroboration, several factors together reduces the credibility of such statements to incredible.  In addition, the statements of the Iraqis are unclear, contradictory in part, and simply state self-interested conclusions as to what occurred within house 4.  Finally, to believe the government version of facts is to disregard clear and convincing evidence to the contrary and sets a dangerous precedent that, in my opinion, may encourage others to bear false witness against Marines as a tactic to erode public support of the Marine Corps and mission in Iraq. Even more dangerous is the potential that a Marine may hesitate at the critical moment when facing the enemy.

Much effort during the Article 32 focused on whether the victims were insurgents. Although determining if they were may have some bearing on the credibility of the Iraqi witnesses and may support that LCpl Sharratt did perceive a hostile situation within house 4, such determinations are not necessary to conclude that LCpl Sharratt is truthful in his account. From as early as February 2006 LCpl Sharratt's statements are supported by the forensic evidence. It is likely that members of the Ahmed family were either insurgents on 19 November 2005, or that they were attempting to defend their house and family when Marines entered house 4 uninvited and unannounced. On that fateful afternoon, Jasib heard someone enter house 4. He investigated with his AK-47 in his hands. LCpl Sharratt saw him and perceived him as a threat. Using his training he responded instinctively, assaulting into the room emptying his pistol. Whether this was a brave act of combat against the enemy or tragedy of misperception born out of conducting combat with an enemy that hides among innocents, LCpl Sharratt's actions were in accord with the rules of engagement and use of force.

**Accordingly I recommend that the Charge and specifications be dismissed without prejudice. I further recommend that LCpl Sharratt be given testimonial immunity and ordered to cooperate with ongoing investigations concerning the events of 19 November 2005.**