# EXHIBIT "1"

## TATUM IO REPORT

# INVESTIGATING OFFICER'S REPORT
*(Of Charges Under Article 32, UCMJ and R.C.M. 405, Manual for Courts-Martial)*

| | | | |
|---|---|---|---|
| 1a. FROM: *(Name of Investigating Officer — Last, First, MI)*<br>Ware, Paul J. | b. GRADE<br>LtCol | c. ORGANIZATION<br>Western Pacific Judicial Circuit | d. DATE OF REPORT<br>23 August 2007 |

| | | | |
|---|---|---|---|
| 2a. TO: *(Name of Officer who directed the investigation -- Last, First, MI)*<br>Mattis, James T. | | b. TITLE<br>Commanding General | c. ORGANIZATION<br>I Marine Expeditionary Force |

| | | | | |
|---|---|---|---|---|
| 3a. NAME OF ACCUSED *(Last, First, MI)*<br>Tatum, Stephen B. | b. GRADE<br>LCpl | c. SSN<br>XXX-XX-2278 | d. ORGANIZATION<br>HqCo, 1st MAR,<br>1st MarDiv,<br>MarForPac,<br>CamPen, CA | e. DATE OF CHARGES<br>21 Dec 2006 |

| | Yes | No |
|---|---|---|
| *(Check appropriate answer)* | | |
| 4. IN ACCORDANCE WITH ARTICLE 32, UCMJ AND R.C.M. 405, MANUAL FOR COURTS-MARTIAL, I HAVE INVESTIGATED THE CHARGES APPENDED HERETO (Exhibit 1) | X | |
| 5. THE ACCUSED WAS REPRESENTED BY COUNSEL. (If not, see 9 below) | X | |
| 6. COUNSEL WHO REPRESENTED THE ACCUSED WAS QUALIFIED UNDER R.C.M. 405(d)(2), 502(d) | X | |

| | | | |
|---|---|---|---|
| 7a. NAME OF DEFENSE COUNSEL *(Last,First,MI)*<br>Cord, Matthew, W. | b. GRADE<br>LtCol | 8a. NAME OF ASSISTANT DEFENSE COUNSEL *(If any)*<br>Zimmerman, Jack B. | b. GRADE<br>CIV |
| c. ORGANIZATION *(If appropriate)*<br>1st MLG, CLR-17, LSSS-C (Defense) | | c. ORGANIZATION *(If appropriate)*<br>Zimmerman & Sampson, P.C. | |
| d. ADDRESS *(If appropriate)*<br>Bldg 22163, Box 555607, Camp Pendleton, CA 92055 | | d. ADDRESS *(If appropriate)*<br>Zimmerman & Sampson, P.C.<br>770 South Post Oak Ln, Suite 620<br>Houston, TX 77056<br>www.texasdefenselawyers.com | |

| | |
|---|---|
| 9. (To be signed by accused if accused waives counsel. If accused does not sign, investigating officer will explain in detail in Item 21.) | |
| a. PLACE | b. DATE |
| I HAVE BEEN INFORMED OF MY RIGHT TO BE REPRESENTED IN THIS INVESTIGATION BY COUNSEL, INCLUDING MY RIGHT TO CIVILIAN OR MILITARY COUNSEL OF MY CHOICE IF REASONABLY AVAILABLE. I WAIVE MY RIGHT TO COUNSEL IN THIS INVESTIGATION. | |
| c. SIGNATURE OF ACCUSED | |

| | Yes | No |
|---|---|---|
| 10. AT THE BEGINNING OF THE INVESTIGATION I INFORMED THE ACCUSED OF: *(Check appropriate answer)* | | |
| a. THE CHARGE(S) UNDER INVESTIGATION | X | |
| b. THE IDENTITY OF THE ACCUSER | X | |
| c. THE RIGHT AGAINST SELF-INCRIMINATION UNDER ARTICLE 31 | X | |
| d. THE PURPOSE OF THE INVESTIGATION | X | |
| e. THE RIGHT TO BE PRESENT THROUGHOUT THE TAKING OF EVIDENCE | X | |
| f. THE WITNESSES AND OTHER EVIDENCE KNOWN TO ME WHICH I EXPECTED TO PRESENT | X | |
| g. THE RIGHT TO CROSS EXAMINE WITNESSES | X | |
| h. THE RIGHT TO HAVE AVAILABLE WITNESSES AND EVIDENCE PRESENTED | X | |
| I. THE RIGHT TO PRESENT ANYTHING IN DEFENSE, EXTENUATION OR MITIGATION | X | |
| j. THE RIGHT TO MAKE A SWORN OR UNSWORN STATEMENT, ORALLY OR IN WRITING | X | |
| 11a. THE ACCUSED AND ACCUSED'S COUNSEL WERE PRESENT THROUGHOUT THE PRESENTATION OF EVIDENCE (If the accused or counsel were absent during any part of the presentation of evidence, complete (b) below.) | | X |

b. STATE THE CIRCUMSTANCES AND DESCRIBE THE PROCEEDINGS CONDUCTED IN THE ABSENCE OF ACCUSED OR COUNSEL
With consent of accused, Maj Munoz (assistant detailed DC) was absent for a period of approximately 15 minutes during one day of testimony

| 12a. THE FOLLOWING WITNESSES TESTIFIED UNDER OATH: *(Check appropriate answer)* | | | | |
|---|---|---|---|---|
| NAME *(Last, First, MI)* | GRADE *(If any)* | ORGANIZATION / ADDRESS *(Whichever is appropriate)* | Yes | No |
| See attached witness list. | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| b. THE SUBSTANCE OF THE TESTIMONY OF THESE WITNESSES HAS BEEN REDUCED TO WRITING AND IS ATTACHED. | X | |
|---|---|---|

**13a. THE FOLLOWING STATEMENTS, DOCUMENTS, OR MATTERS WERE CONSIDERED. THE ACCUSED WAS PERMITTED TO EXAMINE EACH.**

| DESCRIPTION OF ITEM | LOCATION OF ORIGINAL *(If not attached)* | | |
|---|---|---|---|
| See attached exhibit list. | | | |
| | | | |
| | | | |
| | | | |

| b. EACH ITEM CONSIDERED, OR A COPY OF THE RECITAL OF THE SUBSTANCE OR NATURE THEREOF, IS ATTACHED. | X | |
|---|---|---|
| 14. THERE ARE GROUNDS TO BELIEVE THAT THE ACCUSED WAS NOT MENTALLY RESPONSIBLE FOR THE OFFENSE(S) OR NOT COMPETENT TO PARTICIPATE IN THE DEFENSE. [See R.C.M. 909, 916(k).] | | X |
| 15. THE DEFENSE DID REQUEST OBJECTIONS TO BE NOTED IN THIS REPORT. *(If Yes, specify in Item 21, below.)* | | X |
| 16. ALL ESSENTIAL WITNESSES WILL BE AVAILABLE IN THE EVENT OF TRIAL. | | X |
| 17. THE CHARGES AND SPECIFICATIONS ARE IN PROPER FORM. | X | |
| 18. REASONABLE GROUNDS EXIST TO BELIEVE THAT THE ACCUSED COMMITTED THE OFFENSE(S) ALLEGED. | X | X |
| 19. I AM NOT AWARE OF ANY GROUNDS, WHICH WOULD DISQUALIFY ME FROM ACTING AS INVESTIGATING OFFICER. [See R.C.M. 405(d)(1).] | X | |

20. I RECOMMEND:
a. TRIAL BY ☐ SUMMARY ☐ SPECIAL ☐ GENERAL COURT-MARTIAL

b. ☐ OTHER *(Specify in Item 21 below)*

21. REMARKS *(Include, as necessary, explanation for any delays in the investigation, and explanation for any "No" answers above.)*

Defense requested delay until 3 August 2007 to submit written argument. Delay granted and excluded under RCM 707. See accompanied report for analysis of reasonable grounds and recommendation.

| 22a. TYPED NAME OF INVESTIGATING OFFICER | b. GRADE | c. ORGANIZATION |
|---|---|---|
| Paul J. Ware | LtCol | Western Pacific Judicial District |

| d. SIGNATURE OF INVESTIGATING OFFICER | e. DATE |
|---|---|
| *[signature]* | 23 August 2007 |

12a  The following witnesses testified under oath:

| | |
|---|---|
| LtCol Elizabeth Rouse, USAF | 4301 Jones Bridge Road, Bethesda, MD 20814-4799 |
| Capt Kathryn Navin | HQBN, Camp Pendleton, CA |
| SSgt Travis Fields | Instructor, School of Infantry-West |
| SSgt Justin Laughner | Combat Logistics Regiment 17, Service Company |
| Sgt Sanick Dela Cruz | Attorney Daniel Marino 1275 Pennsylvania Ave NW, Washington DC 20006, (202) 383-1062 |
| Cpl Robert Stafford | Weapons Training Battalion, Marine Corps Recruit Depot, Parris Island, SC |
| HM3 Matthew Lopez | 13th MEU |
| LCpl Humberto Mendoza | Attorney Jamie McCall 1701 Market Street, Philadelphia, PA 19103-2921 |
| Mr. Daniel Callaway | 10200 Belle Rive Blvd, #4204, Jacksonville, FL 32256 |
| Mr. Trent Aaron Graviss | 9800 Wilton Dr, Fairdale, KY |
| Mr. Lucian Reed | 508 East 12th Street, Apt #22, New York, NY 1009 |
| Mr. Hashim Malek | PO Box 251381, Glendale, CA 91225-1381 |
| Special Agent Brian Brittingham | NCIS, Washington D.C. |

| | |
|---|---|
| Investigator Tony Flores | NCIS, Camp Pendleton, CA |
| Special Agent Michael S. Maloney | NCIS, Far East Region, Okinawa Japan |
| Special Agent Michael Wright | NCIS, Norfolk, VA |
| Special Agent Kelly Garbo | NCIS, Washington, D.C. |
| Special Agent Thomas Brady | NCIS, Washington, D.C. |
| Special Agent Nayda M. Mannle | NCIS, Washington, D.C. |
| Special Agent Matthew Marshall | NCIS, Camp Pendleton CA |
| Special Agent Mark Platt | NCIS, Washington, D.C. |

13a.  The following statements, documents or matters were considered; the accused was permitted to examine each.  The defense objected to several documents based on relevance and that the document was unsworn.  The objections to unsworn statement were sustained.  Additionally, the defense objected to alleged statements made by LCpl Tatum to NCIS agents on 9 and 17 May 2007 under MRE 305 incorporating MRE 304.  I denied that motion but am including within the legal issues discussion advice that such statements are likely subject to further litigation and are not necessarily admissible at trial.  All documents not considered based on sustaining objections or because they were later withdrawn by either party were not considered.  For clarity in the report, admitted exhibits were not renumbered.  Those that were not considered and not part of my analysis are listed below as "removed".

1.    Charge Sheet & Appointing Order

2.    Email between LtCol Sullivan and Col Chester dtd 06 Feb 07 through 07 Feb 07, RE:  Excludable Delay

3.    LtCol Sullivan's ltr 5800 TC/SMS of 05 Mar 07

4.    LtGen Mattis' ltr 5800 LSST-C of 07 Mar 07

5.    Maj Erickson ltr 5811 LSST-C of 19 Jun 07, RE: Request for Continuance

6.  Trial Counsel email to Defense Counsel dtd 21 June
    2007, RE:  request by LCpl Tatum for other charged
    Marines to testify

7.  Email by Defense Counsel for LtCol Chessani dtd 21
    June 2007, RE:  denial of request by LCpl Tatum for
    LtCol Chessani to testify

8.   Email by Defense Counsel for Capt McConnell dtd 21
    June 2007, RE:  denial of request by LCpl Tatum for
    Capt McConnell to testify

9.  Email by Defense Counsel for SSgt Wuterich dtd 21 June
    2007, RE:  denial of request by LCpl Tatum for SSgt
    Wuterich to testify

10. Memorandum for Record dtd 01 May 07, RE:  Tim McGirk

11. Testimonial Immunity Documents, RE:  SSgt Laughner

12. Testimonial Immunity Documents, RE:  Sgt Dela Cruz

13. Testimonial Immunity Documents, RE:  LCpl Mendoza

14. OMPF of LCpl Tatum

15. Service Record Book of LCpl Tatum

16. Results of Review of Photographs and Video Provided by
    Khalid Salman Rasif / 30 Mar 06 (12 Sept 06 ROI, Ex.
    381) (House #1 and House #2 photos)

17. RCFL review of Maj Hyatt's Image Hard Drive (12 Sept
    06 ROI, Ex. 424) (House #1 and House #2 photos)

18. Death certificates of House #1 and House #2 victims
    (12 Apr 06 ROI, Ex. 48)

19. Translation of Death certificates of House #1 and
    House #2 victims (3 Aug 06 ROI, Ex. 377)

20. Medical Examination of House #1 and House #2 victims
    (3 Aug 06 ROI, Ex. 378)

21. House #1 and House #2 victim photos pre-death (12 Sept
    ROI, Ex. 491, pp. 897-903, 906, 909-912, and 917-918)

3

22. House #1 and House #2 victim photos post-death from
    LCpl Wright (12 Sept ROI, Ex. 412, pp. 295-322)

23. House #1 and House #2 victim photos post-death from
    SSgt Laughner(12 Sept ROI, Ex. 455, pp. 556-565, 584,
    and 602-619)

24. Eman Waleed Al Hameed U.S. Navy Medical Records

25. Al-Rahman Waleed Al-Hameed U.S. Navy Medical Records

26. Removed
27. Removed
28. Removed

29. Deposition transcript of 1stLt William Kallop taken 7
    May 2006

30. Statement of SSgt Frank D. Wuterich with Rights
    Advisement and Rights Waiver dtd 21 Feb 06

31. Removed
32. Removed
33. Removed

34. Statement of Sgt Sanick Dela Cruz with Rights
    Advisement and Rights Waiver dtd 19 Feb 06

35. Removed
36. Removed
37. Removed
38. Removed
39. Removed
40. Removed

41. Statement of Sgt Hector R. Salinas with Rights
Advisement and Rights Waiver dtd 19 Feb 06

42. Statement of Sgt Hector R. Salinas with Rights
Advisement and Rights Waiver dtd 18 Mar 06

43. Statement of Sgt Hector R. Salinas with Rights
Advisement and Rights Waiver dtd 19 Mar 06

44. Statement of Sgt Hector R. Salinas with Rights
Advisement and Rights Waiver dtd 24 Mar 06

45. Statement of LCpl Steven B. Tatum with Rights
    Advisement and Rights Waiver dtd 19 Feb 06

46. Statement of LCpl Steven B. Tatum with Rights
    Advisement and Rights Waiver dtd 19 Mar 06

47. Statement of LCpl Steven B. Tatum with Rights
    Advisement and Rights Waiver dtd 24 Mar 06

48. Statement of LCpl Steven B. Tatum with Rights
    Advisement and Rights Waiver dtd 3 Apr 06

49. Results of Interview LCpl Steven B. Tatum with Rights
    Advisement and Rights Waiver dtd 9 May 06

50. Results of Interview LCpl Steven B. Tatum with Rights
    Advisement and Rights Waiver dtd 17 May 06

51. Statement of LCpl Justin L. Sharrat with Rights
    Advisement and Rights Waiver dtd 19 Feb 06

52. Statement of LCpl Justin L. Sharrat with Rights
    Advisement and Rights Waiver dtd 19 Mar 06

53. Statement of LCpl Justin L. Sharrat with Rights
    Advisement and Rights Waiver dtd 24 Mar 06

54. Results of Death Scene Investigation from 3 Aug ROI,
    RE:  House #1

55. Results of Death Scene Investigation from 3 Aug ROI,
    RE:  House #2

56. IA: Results of Forensic Reconstruction & Pathology of
    House #1 dtd 16Oct06

57. IA: Results of Forensic Reconstruction & Pathology of
    House #2 dtd 16Oct06

58. IA: Result of Forensic Analysis of House #1 dtd
    15Nov06

59. IA: Result of Forensic Analysis of House #2 dtd
    15Nov06

60. Video recorded sworn interview of Khalid Salman Rasif Hussayn Al-Anzi dtd 22Jan07 (with translator declaration)

61. Video recorded sworn interview of Abd Al-Rahman Waleed Al-Hameed dtd 23Jan07 (with translator declaration)

62. Video recorded sworn interview of Eman Waleed Abd Al-Hameed dtd 23Jan07 (with translator declaration)

63. Video recorded sworn interview of Safah Yunis Salim Rasif dtd 23Jan07 (with translator declaration)

64. Video recorded sworn interview of Yasin Salim Rasif Hussayn dtd 23Jan07 (with translator declaration)

65. Video recorded sworn interview of Jameel Mahmood Aashoor Lateef dtd 20Jan07 (with translator declaration)

66. Results of Interview of Khalid Salman Rasif Hussayn dtd 6Jun06 (with sworn affidavit)

67. Results of Interview of Safah Yunis Salim dtd 8Jun06

68. Memorandum of Capt Tim Garrison dtd 23 January 07, RE: identification of Iraqi victims and witnesses

69. Transcript of interview of LCpl Rodriguez dtd 28Mar07

70. Removed

71. Transcript of interview of Cpl Stafford dtd 19Jan07

72. Transcript of interview of LCpl Zuniga dtd 19Jan07

73. Cpl Harmala 19 Nov 05 video

74. 2nd MARDIV ROE Card Effective 15 Apr 05 (MajGen Bargewell Rpt, Encl. 130)

75. Appendix 6 to Annex C to MNF-W Operations Order 1-05 (Operation Iraqi Freedom 04-06 Campaign Plan) Rules of Engagement (Col Watt Invest, Encl 12)

76. Tab A to appendix 6 to MNF-W Operations Order 1-05 (Operation Iraqi Freedom 04-06 Campaign Plan) [MNF-W ROE CARD]

77. Removed
78. Removed

79. K Co, 3rd Bn, 1st Marine Regiment Training Calendar Schedules dtd July 05
80. Predeployment Class- ROE taught by Capt Navin in July 05
81. Removed
82. Removed
83. Removed
84. Removed
85. Removed
86. Removed
87. Removed
88. Removed
89. Removed
90. Removed
91. Removed
92. Removed
93. Removed
94. Removed
95. Removed
96. Removed
97. Removed
98. Removed
99. Removed
100. Removed
101. Removed
102. Removed
103. Removed
104. Removed
105. Removed
106. Removed

107. CV of SA Mike Maloney

108. CV of SA Tom Brady

109. CV of LtCol Elizabeth Rouse

110. CV of Mr. Ross Gardner

111. Removed

112. Removed

113. U.S. v. Capt Stone, USMC, Article 32 Witness Testimony transcript of Capt Dinsmore

114. NCIS statements of LCpl Zelada

115. Email by Defense Counsel for LCpl Sharratt dtd 23 June 2007, re: denial of request by LCpl Tatum for LCpl Sharratt to testify

116. Deposition transcript of 1stLt Frank taken 29 March 2007

117. Deposition transcript of 1stLt Mathes taken 28-29 March 2007

118. U.S. v. Capt Stone, USMC, Article 32 Witness Testimony transcript of 1stLt Mathes

119. Deposition transcript of 2ndLt Martin taken 29 March 2007

120. Deposition transcript of GySgt Dunlap taken 29 March 2007

121. Satellite images of Haditha , Iraq in the vicinity of Route Chestnut and Viper (Google Earth)

122. House #1 Pathology Report dtd 14 Dec 06

123. House #2 Pathology Report dtd 14 Dec 06

124. IA: Eman Waleed Al-Hameed dtd 08 Jun 06

125. NCIS statements of HN Hatch

126. Mr. Tim Garrison memo, RE:  unable to attend article 32

127. bate stamped photos of Wright that were authenticated with Iraqi witnesses

128. Capt Garrison memo signed, re:  unavailability

129. Congressman Murtha comments

130. Briefs from Defense re Tatum statements, part 1

131. Brief part II

132. brief Part III

133. photo of Abdul in H1

134. photo of kamisa

135. Laughner diagram march 2006

136. back bedroom photo

137. Mendoza watt statement dated 19 February 06

138. Mendoza 18 Mar 06 statement

139. Mendoza 24 March statement by NCIS

140. Mendoza's 8 April 06 (polygraph)

141. Guzman interview notes dated 9 May 06

142. Defense summation of Lt Kallop deposition

143. LCpl Tatum private polygraph report

144. Col Watt investigation report of Lt Kallop

145. Col Ewers investigation of Lt Kallop

146. Lt Kallop interview of 24 Nov 06 by NCIS

147. Defense summary of Lt Kallop statements

148. Safah affidavit

149. Removed

150. Government first brief response to defense motion to suppress Tatum statements

151. Government second brief response to defense motion to suppress Tatum statements

152. Government third brief response to defense motion to suppress Iraqi statements

153. Defense discovery request

154. Authenticated photo House 2 by SA McDaniel

155. Defense summary of Capt Dinsmore testimony at Capt Stone Article 32 hearing

156. Capt Dinsmore deposition

157. Defense summary of Capt Dinsmore Deposition

158. Capt Dinsmore 15 September 06 statement

159. Capt Dinsmore 26 March 06 statement

160. Capt Dinsmore 2 June 06 statement

161. Defense summary of Capt Dinsmore statements

162. photo of House 1 victims woman and boy

163. photo of House 1 victim boy

164. photo of House 1 victims kneeling

165. photo of House 1 photo of woman kneeling

166. photo of House 1 living room without victims

167. Laughner photo of House 1 victims kneeling modified by Tom Brady

168. distant photo of ridgeline runner

169. close up photo of ridgeline runner

170. M67 frag grenade photo

171. Laughner photo

172. notes from sa brady

173. photos of defense prop of Styrofoam head

174. March 06 diagram of SSgt Laughner

175. June 06 diagram of SSgt Laughner

176. photo of H2 bedroom

177. photo of H2 kitchen

178. audio recording of forensic experts on scene in H2

179. photo of SE corner of the exterior of H2

180. photo of person standing to the right of the H2 bedroom post body removal

181. photo of H2 bedroom post body removal

182. Abid's statement given to SA Platt on June 06

183. 2nd discovery request by defense, re:  LCpl Tatum's recorded telephone call

184. Transcript of Eman cnn interview

185. movie of Eman cnn interview

186. LCpl Tatum's request for immunity of Sgt Salinas

187. Abdel Rachman June 06 interview notes (SA McLaughlin)

188. Rasif IA dtd 10 June 06

189. Shams Al Deen Jan 07 interview

190. Dr. Waleed Jan 07 interview

191. photo of House 1 victims with editorial comments

192. photo of House 1 boy with editorial comments

193. photo of House 1 woman with editorial comments

194. Capt McConnell interview with Col Ewers dtd 19 Mar 06

195. Stmt of Capt McConnell dtd 18 Feb 06

196. Defense summary of IE 194 and 195

197. 20 Dec 06, USMC briefing, re:  Haditha, Iraqi

198. Sgt Wolf testimony dtd 13 June 07

199. ROI Khalid Salman dtd 20 June 06

200. Daily Intel Summary dtd 18 Nov 05

201. Interview of Safah Yunis (rough transcript) dtd 15 Mar 06

202. Capt Garrison memo, re:  Iraqi identification of deceased relatives

203. Letter from Mr. Zimmerman, RE:  Ernie Hulsey

204. NCIS wire tap of LCpl Tatum CD and transcript

205. Routing sheet, RE:  LCpl Mendoza Immunity Documents

206. Government Power Point Presentation

207. Defense Power Point Presentation

208. Interview with Eman

209. Interview with Hibba taken by Thaer

210. NCIS policy manual excerpts

211. Affidavit of Martin Terrazas

212. Defense written comment on the evidence

213. Government written comment on the evidence

## Summary of facts

On 19 November 2005, in Haditha, Iraq, Lance Corporal (LCpl) Tatum was a passenger in the third vehicle of a four vehicle convoy. As the convoy traveled down route Chestnut on a logistics mission, an Improvised Explosive Device (IED) exploded under the fourth vehicle in the convoy. LCpl Tatum ran to the vehicle that was damaged to assist with any Marines who were injured. LCpl Terrazas was mortally wounded, LCpl Guzman suffered minor injuries and LCpl Crossan was stuck under debris from the damaged vehicle and had suffered significant injuries. LCpl Tatum assisted in pulling LCpl Crossan out of the debris and began first aid under the direction of Corpsman Whitt. While LCpl Tatum was administering to LCpl Crossan he heard gunfire to the West and South. He also heard sporadic gunfire from the North but did not return fire. Lieutenant (Lt) Kallop arrived on scene and after receiving fire from the South he ordered Staff Sergeant (SSgt) Wuterich to lead a fire team south to clear the house from where he believed the fire originated. Corporal (Cpl) Salinas fired an M203 round toward the houses to the South. LCpl Tatum joined SSgt Wuterich, Cpl Salinas, Lt Kallop and LCpl Sharratt to clear the houses to the South. LCpl Mendoza ran to catch up. On the way to house 1, (as identified in the investigation), LCpl Sharratt returned to his vehicle to retrieve an M240G weapon. Lt Kallop also stopped heading South when he received word from another Marine that Marines may have located the trigger house for the IED to the North. SSgt Wuterich led the remaining Marines, Cpl Salinas, LCpl Mendoza and LCpl Tatum to house 1 advising them that the house was to be treated as hostile.

Cpl Salinas then entered house 1 and shot and killed Khamisa Tuema Ali in the hallway by the stairs. SSgt Wuterich and LCpl Tatum followed into the hallway with LCpl Mendoza entering last. LCpl Mendoza moved to the room to the right of the hallway, observed Guhid Abdal Hameed Hasan (Guhid) inside the room and shot him when Guhid made a movement toward the closet. While Cpl Salinas, LCpl Tatum and SSgt Wuterich were still in the hallway they heard a noise coming from the room to their left. Cpl Salinas and SSgt Wuterich were convinced that sound was the sound of an AK-47 rifle being racked. LCpl Tatum agreed, so he and Cpl Salinas threw grenades into the room. One of the two grenades exploded and shortly after the blast, SSgt Wuterich and LCpl Tatum entered the room and began firing at occupants in the room. As a result Abdul Hameed Husin Ali (Abdul), Waleed Abdul Hameed Hasan, Abdullah Waleed Abdul Hameed (Abdullah) and Asmaa Salman Rasif (Asmaa) were killed and Eman Waleed Abd Al Hameed and Abd Al-Rahman Waleed Al Hameed were injured by a combination of the grenade fragments and or bullets.

After the gunfire ceased, SSgt Wuterich announced that someone ran out of the house toward house 2 (as identified in the investigation). SSgt Wuterich ordered the Marines to leave house 1 and pursue the runner into house 2. LCpl Tatum was the last to arrive at house 2. SSgt Wuterich, Cpl Salinas and LCpl Mendoza had taken positions outside house 2 next to one door. LCpl Mendoza kept watch toward a second door. One of the Marines knocked or rang a bell at the door. As Yunis Salim Rasif approached the second door, LCpl Mendoza shot through the door and killed him. Meanwhile, LCpl Tatum, who was still lagging behind the group, witnessed LCpl Mendoza shooting the man through the door as he caught up to the others at the house. SSgt Wuterich and LCpl

Mendoza entered house 2. When LCpl Tatum arrived at the door, SSgt Wuterich ordered LCpl Tatum to "frag" the next room in the home. LCpl Tatum obtained a grenade from Cpl Salinas and threw it into the room adjacent to the kitchen. It exploded, damaging the pipes in the shower room. Unknown to the Marines at that time was that there were two adult women and six children in the far back corner room of the house 2. SSgt Wuterich ordered the Marines to continue to clear house 2. LCpl Mendoza positioned himself inside the home in either the hallway or the kitchen. Cpl Salinas stayed outside house 2 and his whereabouts are not in evidence. At some point a Marine threw a grenade into the back room but it did not explode. Later, SSgt Wuterich entered the room and began firing at the occupants. LCpl Tatum entered the room second and fired his weapon toward the bed. As a result, Aida Yasin Ahmed, Mohomed Yunis Salim, Aisha Unes Salim, Zainab Unes Salim, Sena Yunis Salim, Noor Salim Rasif, Yuda Hasin Ahmed were killed.

### Analysis of evidence

The test I applied to determine if reasonable grounds exist is whether the _set of circumstances would satisfy an ordinary, cautious and prudent person, that there is reason to believe an offense has been committed._ Reasonable grounds must be more than suspicion or the ability to theorize a criminal act from a set of facts excluding all evidence to the contrary. Although the government does not have to prove the allegations are true at an Article 32 investigation, it must present credible evidence to support the conclusion that reasonable grounds exist to believe that a crime was committed.

However, an Investigating Officer's duties require more than a simple inquiry into whether there are reasonable grounds. It is an examination of the evidence to inquire into the truth of the evidence and to analyze the evidence to provide impartial advice to the Convening Authority with regard to a disposition of the charges. It is the truth of the evidence coupled with careful analysis of the strengths and weaknesses that should be the foundation for an Investigating Officer's recommendation.

#### _What is the test for whether a killing is wrongful under the rules of engagement?_

Despite significant evidentiary hurdles ranging from a lack of ballistics, identification of the assailant and actual cause of death, the ultimate issue involved in this Article 32 investigation is whether there is a reasonable ground to find that the killings or force used was not done pursuant to legal authorization.

In most homicide cases, a killing can be presumed to be unlawful absent evidence to the contrary. That is not the same as placing a burden of raising an affirmative defense upon the accused but recognition that in our society, killing another is not normally legal or authorized. There are two obvious exceptions to which the presumption of a killing is not lawful, law enforcement and military combat operation. Marines engaged in combat are expected to kill. This legal authority to kill, however, is certainly not absolute. Our Marine Corps makes great efforts to ensure Marines are educated and trained on the limits of the authority to kill under the rules of engagement.

14

In a homicide case arising from actions by a Marine within a combat environment, the government may not rest on the normal presumption that killing is wrong and is therefore burdened with proving that the killing was in violation of the rules of engagement. The ambiguity that arises in this case is not what the rules of engagement require, but how those rules are applied for criminal liability. Is the requirement to identify hostile act and intent based on subjective or objective criteria? If it is subjective, does that belief have to be honest and reasonable or just honest? If it is an objective test, is that based on the experience of a basic trained Marine or a combat veteran? Government witnesses indicated that the test was subjective. My opinion is that the test should be a subjective, honest and reasonable belief so that Marines in combat that are acting in good faith have the protections of the rules of engagement if they honestly perceive hostile acts or intent and make a decision to use deadly force that in hindsight, with time to reflect, others might consider such a decision to be a mistake.

### House 1 charges

The elements of the charged offenses of Negligent Homicide in violation of Article 134 are:

> (1) That (*state the name or description of the alleged victim*) is dead;

> (2) That his/her death resulted from the (act) (failure to act) of the accused, to wit: (*state the act or failure to act alleged*), (*state the time and place alleged*);

> (3) That the killing by the accused was unlawful;

> (4) That the (act) (failure to act) of the accused which caused the death amounted to simple negligence; and

> (5) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

The elements of the charged offense of Aggravated Assault with a dangerous weapon in violation of Article 128 are:

> (1) That (*state the time and place alleged*) the accused (attempted to do) (offered to do) (did) bodily harm to (*state the name of the alleged victim*);

> (2) That the accused did so with a certain (weapon) (means) (force) by (*state the manner alleged*);

> (3) That the (attempt) (offer) (bodily harm) was done with unlawful force or violence; (and)

> (4) That the (weapon) (means) (force) was used in a manner likely to produce death or grievous bodily harm.

The evidence presented at the Article 32 satisfies all the elements of both Negligent Homicide and Aggravated Assault with a dangerous weapon except for the third element for each charge respectively. It is important to note that the government will have significant legal difficulties in proving cause of death especially if Eman and Abd do not testify at trial; However for the purposes of the Article 32 it is reasonable to infer that LCpl Tatum and or SSgt Wuterich working in concert caused the death of the named individuals. The remainder of the discussion of the evidence for house 1 will center on the question of whether the government has sufficient evidence to support a finding that there are reasonable grounds to believe that the killings and force used were unlawful.

### Different accounts of events in house 1

LCpl Mendoza:

LCpl Mendoza testified that when he first saw Guhid in the room he was unsure what to do so he asked Cpl Salinas how to handle the situation. Cpl Salinas told him to shoot the individual. LCpl Mendoza returned to the room and then saw Guhid moving toward the closet. He became scared and believed Guhid was going to retrieve a weapon so he fired 5 to 6 rounds into Guhid. LCpl Tatum entered the room and went over to the body of Guhid and shot into the body saying he was making a dead check. LCpl Mendoza has no memory of a grenade explosion or other gunfire occurring inside house 1. LCpl Mendoza's previous statements to NCIS make no mention of asking for advice from Cpl Salinas or that LCpl Tatum shot the body of Guhid.

Special Agent Marshall:

Special Agent Marshall testified that LCpl Tatum told him that he did positively identify targets within the room in question for house 1 by using a size method. He also testified that LCpl Tatum believed he heard a metal on metal sound and when SSgt Wuterich and Cpl Salinas said it was an AK-47 he thought that made sense and agreed. He also testified that LCpl Tatum was confused concerning the order of events of when he entered the room, whether it was right after the grenade explosion or after clearing house 2. Additionally, he testified that LCpl Tatum believed house 1 was hostile and that he entered the room believing someone had a weapon inside. Unlike all previous statements taken by Naval Criminal Investigative Service (NCIS) from LCpl Tatum, Special Agent Marshall did not have LCpl Tatum sign and swear to these statements, or record by any electronic means this conversation. Special Agent Marshall did request permission from superiors to videotape or record the interview of LCpl Tatum but that request was denied. The substance of this testimony is from the memory of Special Agent Marshall and notes taken and written up as a result of interview.

LCpl Tatum:

In three signed, sworn statements, (two of which are to NCIS) LCpl Tatum denies positively identifying any persons within house 1. He also states that he heard an AK-47 rack inside the room in question and considered house 1 hostile. LCpl Tatum's statements make no mention of performing a dead check on the body of Guhid.

Cpl Salinas:

Cpl Salinas' signed, sworn statements contain nothing about LCpl Mendoza seeking advice on what to do inside house 1. He also states he heard an AK-47 racking sound from the room to the left of the hallway and "double fragged" the room with LCpl Tatum. He heard one explosion and states that they did not clear the room but instead went to house 2 because someone yelled out "there is a runner".

Abd Al-Rahman Waleed Al Hameed (Abd):

The interpreter for IE 61 related that Abd was inside the room and witnessed a "flash bang" and that his grandfather's "meat" came off inside the room. While initially saying that his Uncle then stepped outside the room and was shot, the interpreter later related that Abd witnessed Marines coming into the room and shooting bullets all over. Abd was injured but someone from off camera responded with a refusal to the trial counsel's request to photograph the scar of the injury. The interpreter also related Abd said he was removed from the home by Marines later that day.

Eman Waleed Abd Al Hameed (Eman):

The interpreter for IE 62 related that Eman said her Aunt Hiba picked up her sister Asia and ran out of the room when a grenade exploded. He also related that Eman said after the explosion of the grenade she witnessed muzzles of rifles pointing into the room from the door and shooting all over the room. The interrupter also related that Eman said she did not see any Marines enter the room and that she was taken from house 1 by Iraqi National Guard.

*Evidence offered fails to support reasonable grounds for charges arising from events in house 1*

The government fails to provide evidence sufficient to make a finding that there are reasonable grounds to charge the accused with any criminal offense in relation to events that occurred in house 1. I based this finding on reviewing all the evidence concerning house 1.

**The evidence demonstrates that positive identification was not required before engaging the targets in the room for the following reasons:**

The government counsel argued that positive identification of occupants of the room was required under the rules of engagement. Such a theory, requiring positive identification before engaging targets in a room that you hear an AK-47 racking within a home that is declared hostile, would appear to be a rewrite of the rules of engagement and is clearly contrary to the training and experiences of the witnesses that testified. The government did not present even one witness that testified that positive identification under such circumstances is required before employing deadly force.

Using the government's theory that positive identification was required within the room of house 1 when LCpl Tatum heard a noise he and his fellow Marines believed was an AK-47 racking, they would be authorized to throw a grenade into the room, but when entering the room they would be required to distinguish between enemy and innocents within the room. Such a result seems counter intuitive. To illustrate this oddity further, if LCpl Tatum had no grenade to toss, upon hearing what he believed was an AK-47 being racked in the room, he would have been required to enter the room, keep his finger on the trigger but not engage any target until he could identify the threat within the room. The rules of engagement do not distinguish between the use of grenades and direct weapon fire when perceiving a hostile act. To find otherwise is to contradict the training our Marines receive in how to clear a room. LCpl Tatum's training was to follow the grenade blast with gunfire to ensure the threat is neutralized. This is a fast paced action requiring a dynamic entry into the room. To use the government theory, LCpl Tatum should have distinguished between hostile targets and innocents before firing his weapon into the room. The end result is that he would be required to expose himself to danger within the room in case there were non hostile persons inside.

Such restraint might be good practice for law enforcement or special operations forces conducting hostage rescue operations, but not in combat. In combat Marines are trained to neutralize the enemy with overwhelming force. If we adopt the theory of liability espoused by the government, we in turn are placing innocents in grave danger as they will become truly effective shields against our Marines engaging the enemy.

Additionally, the government presented no evidence of any practical exercise, discussion, lecture, power point slide, field operation or tactical war game where the accused was placed in a simulated combat environment and was required to distinguish legitimate targets from innocents within a room. In my opinion, pursuing charges for offenses in house 1 under this theory would significantly impact combat operations and is an unwarranted, ill conceived, and dangerous application of restraint.

An alternative theory is that the Marines entered house 1 with the intent to kill the inhabitants out of rage for the IED blast and a rush to engage in combat. Special Agent Marshall testified that LCpl Tatum was confused of what time he entered the room to clear it. If a grenade was thrown and then the Marines left returning after the events of house 2 and then fired at the occupants, positive identification would surely be required. However, this theory is entirely unsupported by the evidence. The government provided no evidence to demonstrate that these Marines proceeded to house 1 for illegitimate reason. The evidence is uncontradicted that a superior, Lt Kallop, ordered Marines to clear house 1 after receiving some fire originating from that location. When Marines receive fire from a location, that is classified as "troops in contact" and structures may be declared hostile. Finally, there is no evidence to contradict that within house 1 the Marines heard a sound which they reasonably and honestly believed was the sound of an AK-47 racking.

The government did present evidence of a forensic reconstruction that suggests that Asmaa and Abdullah were shot at close range from behind. This would mean that the assailant would have to be to the left rear of the victims and firing downward. However,

18

cause of death cannot be forensically determined, nor can ballistics identify the weapon used. Both SSgt Wuterich and LCpl Tatum fired into the room. Eman and LCpl Tatum describe the gunfire occurring from the door. LCpl Tatum and LCpl Sharratt describe returning to house 1 and LCpl Sharratt cleared the room by fire, meaning by firing his 9 mm pistol all around the room. There is simply no evidence that places LCpl Tatum within the room in a position in which he could have shot Asmaa and Abdullah as Special Agent Brady suggests. With no ballistics tests, no witnesses and no forensic way to demonstrate LCpl Tatum was in that position, it is mere unsupported speculation that LCpl Tatum killed Asmaa and Abdullah from location testified by Special Agent Brady.

Special Agent Brady was challenged with an alternative theory that Asmaa was holding Abdullah in an effort to protect him. A round impacted Abdullah which caused blood and human matter to deposit onto the chest of Asmaa, and as she falls forward, Abdullah hits the wall and falls forward. Special Agent Brady concluded that the defense alternative theory was biomechanically not possible, however he conceded that his reconstruction was limited due to incomplete photographs of the death scene and LtCol Rouse's pathology report which could not identify the cause of death or actual wound entrance. Certainly, LtCol Rouse identified the obvious wound defect to the left temple of Abdullah but she could not conclude that was the only wound to Abdullah nor could she provide Special Agent Brady a definitive entrance for the wound depicted.

Additionally, Special Agent Brady's reconstruction must assume that the bodies were not moved from the time the wounds were inflicted to when SSgt Laughner arrived. This is a troubling assumption. The photograph of Abdul shows a sheet over his face and then later photographs with the sheet removed but with no holes in the sheet and only blood located where it would have been touching the wounds of his face. This suggests someone placed a sheet over his face after the injuries occurred and before SSgt Laughner arrived. Eman and Abd remained in the room after the shooting for a period of time undetermined before SSgt Laughner took the photographs used in the reconstruction. Marines or Iraqi soldiers entered the house on at least one other occasion prior to SSgt Laughner's photographs and finally, at some point a fire with an unknown source was started after the Marines left house 1 but before Eman and Abd were taken from house 1.

From observing Special Agent Brady testify, I am convinced he professionally reconstructed the death scene but was handicapped in his analysis with incomplete photographs of the death scene, a lack of ballistic, autopsy and environmental segments and a "rush" for his conclusions to be published before his analysis by superiors within NCIS. In my opinion, his forensic reconstruction will have great difficulty surviving close scrutiny at a trial. His rejection of the defense theory appeared to me less of a careful analysis of the theory than a desire to defend his forensic conclusions.

More importantly, even if the reconstruction were capable of proving the location of the assailant was to the left and rear when the wound on Abdullah was inflicted, there is no evidence that places LCpl Tatum at that location within the room. All the evidence concerning LCpl Tatum's actions in house 1 demonstrates he threw a grenade into the

room and after SSgt Wuterich went into the room he fired his weapon at targets on the right side of the room from just inside the doorway.

### The evidence presented demonstrates that LCpl Tatum followed the rules of engagement within house 1.

In house 1, LCpl Tatum never witnesses hostile acts or intent on the part of any people killed. He does however receive an order from SSgt Wuterich to clear house 1, is told the house is hostile, hears Cpl Salinas and LCpl Mendoza firing their weapons, hears a sound that others confirm sounds like an AK-47 being racked and engages the room where the sound came from with grenade and gunfire as he was trained to do. Exhibits 74, 75, 80 and the testimony of witnesses live and in deposition demonstrates that in a troops in contact situation, or if a house is declared hostile because you received fire from the direction of the house or while inside a structure you hear a sound that you honestly and reasonably believe is an indication that a weapon is being prepared, **that is positive identification of hostile act and or intent and no specific individualized positive identification is required within the room while employing deadly force to clear the room.**

Among the key pieces of evidence for this conclusion are:

- Marines, including Lt Kallop and LCpl Mendoza, observed incoming fire originating from the vicinity of house 1.

- Lt Kallop ordered Marines to clear the southern houses, pointing and running toward house 1. LCpl Tatum was part of the fire team responding to that order.

- Cpl Salinas fired an M203 round toward house 1 to mark the house as the one to be cleared and yelled out to LCpl Tatum and LCpl Mendoza to join him in clearing houses to the south.

- Field training, practical applications, lectures and power point slides taught LCpl Tatum that if you receive fire from a building, that building and the occupants are declared as hostile.

- In clearing a hostile house while in a troops in contact situation, Marines were taught and believed that the rules of engagement do not require Marines to make further positive identification before using deadly force.

- Upon entering house 1, Cpl Salinas shot and killed one person which LCpl Tatum heard, then later observed the body lying in the hallway.

- In a second room LCpl Mendoza fired and killed a military aged male. LCpl Mendoza testified that he did not perceive a hostile act or intent from

20

this man when he first saw him however, when returning to the room he interpreted the man turning toward the closet as a hostile act possibly retrieving a weapon. Certainly, LCpl Mendoza had in his mindset house 1 was a dangerous house otherwise the act of looking into the closet could not reasonably be interpreted as a hostile act or intent. The government knew this account prior to extending immunity, arguably after concluding that his actions were in accord with the rules of engagement.

- Cpl Salinas, SSgt Wuterich and LCpl Tatum all heard a sound which they believed was an AK-47 being racked in a room.

- Training in accordance with the rules of engagement taught that in such situations you are to throw a grenade into the room and follow the explosion by tactically entering the room and firing your weapon in a coordinated manner with other members of your fire team.

- Cpl Salinas and LCpl Tatum threw grenades into the room in question and SSgt Wuterich and LCpl Tatum followed up that use of deadly force by employing the approved tactic of firing M16A4 rounds at the occupants of the room.

- Statements by a survivor, Eman, supports that the rifle fire occurred from the doorway.

Accordingly the government has failed its burden to demonstrate reasonable grounds to believe LCpl Tatum committed a crime within house 1.

## House 2 charges

The elements of the charged offense of Murder under Article 118(2) are:

(1) That a certain named or described person is dead;

(2) That the death resulted from the act or omission of the accused;

(3) That the killing was unlawful; and

(4) That, at the time of the killing, the accused had the intent to kill or

inflict great bodily harm upon a person.

The evidence presented at the Article 32 satisfies the first elements for Article 118 (2), that persons are dead. It is more problematic to say that the evidence demonstrates that the accused caused the deaths but it is a reasonable interpretation that LCpl Tatum and or SSgt Wuterich working in concert caused the death of the named individuals. The crux of this case centers on the question of whether the government has sufficient evidence to

21

support a finding that there are reasonable grounds to believe that the killings were unlawful.

At the conclusion of the hearing, I posed a question to counsel that focused on what I believe is a key issue with regard to the evidence of events in house 2. "Does criminal liability apply to a Marine, if that Marine reasonably relies on another Marine's perception of hostile intent or act and does not personally observe any hostile intent or act, and subsequently it is found that the Marine who made the hostile act or intent determination was either negligently mistaken or willfully ignoring the rules of engagement?" This does not "presuppose that probable cause exists to believe the accused committed the alleged offense" as government claims in its written submission. Nor is it asking the government to comment on an affirmative defense or even self defense. It cuts right to the core of the evidence in house 2.

## Different accounts of events in house 2

### LCpl Mendoza:

LCpl Mendoza testified that after entering house 2, he handed a grenade to LCpl Tatum. LCpl Tatum threw the grenade into the room next to the kitchen and it exploded. After the explosion, LCpl Mendoza said he went down the hall and opened the door to the back room. Inside he saw about 5 to 6 children and women. He believed they looked scared and he did not perceive any hostile intent or act on their part. He closed the door and spoke to LCpl Tatum telling him that the back room had women and kids in it. LCpl Tatum responded, "shoot them". LCpl Mendoza repeated that "it is just women and kids" and left LCpl Tatum to post security near the kitchen. LCpl Tatum walked down the hall. A short time after, LCpl Mendoza heard gunfire from the back of the house but did not investigate the location where the gunfire was occuring. LCpl Mendoza did not witness anyone entering the back room of house 2 and is not a witness to the gunfire.

### LCpl Tatum:

LCpl Tatum's statements to NCIS prior to May 2007 and in his unsworn statement at the Article 32 hearing deny knowledge that there were women and children in the back room of house 2 prior to shooting. His version of events is that he received a grenade from Cpl Salinas and threw the grenade into the shower room as directed by SSgt Wuterich. After the explosion he and SSgt Wuterich went down the hall to clear the remaining rooms. He entered an empty room on the left side of the hallway and while looking around heard gunfire coming from the adjacent room to the right. He quickly responded to the gunfire by going to the room. Upon seeing SSgt Wuterich engaging targets in the far side of the room, he opened fire. He did not use positive ID because he considered the house hostile and was responding in assistance to SSgt Wuterich who was already engaging the targets.

22

In an interview with agents from NCIS in April and May 2007, NCIS alleges that LCpl Tatum made oral confessions that he did identify that there were children in the back room of house 2 prior to shooting at them.

Safah Yunis Salim Rasif:

The lone surviving Iraqi witness from house 2, Safah Yunis Salim Rasif (Safah), provided statements through an interpreter that are consistent with both versions of events. The exception is that she states that a Marine threw a grenade into the room and closed the door. The grenade did not explode. The grenade caused them all to move to the back part of the room near the bed. After hearing what sounded like pipes bursting and running water coming from down the hall, her Aunt opened the door and saw Yunis lying on the ground. Her Aunt started to scream and was then shot through the doorway by a Marine. The Marine continued into the room and started shooting at everyone on the bed. She dived to the corner between the wall and bed and was not hit with any bullets. She described the first Marine as being shorter than her. A second Marine entered the room and started shooting and attempted to shoot her under the bed but the rounds missed her leg.

*Evidence offered to support reasonable grounds for charges arising from events occurring in house 2*

Special Agent Maloney created a forensic reconstruction with three shooter positions. This reconstruction corroborates the statements of LCpl Tatum and Safah. The location of the shooters, angles of impact and resulting actions of the victims is logical, concise and convincing. However, the issue for this Article 32 is not the *actus reas*, but the *mens reas* of LCpl Tatum.

While recognizing there are significant evidentiary problem which I will discuss later, the ultimate question with regard to reasonable grounds for charges in house 2 is the testimony of LCpl Mendoza and the statements of LCpl Tatum. Safah's interpreted statements corroborate the majority of LCpl Tatum's version of events with the exception that she said it was light in the room and that shooter two attempted to shoot her from under the bed. She cannot confirm or contradict whether LCpl Mendoza and LCpl Tatum had a conversation or that LCpl Mendoza was the person who looked into the room and threw a grenade. A significant difference is that LCpl Mendoza does not relate he threw a grenade into the room but Safah said the Marine who first looked into the room threw a grenade inside the room causing them to move to the back corner by the bed.

The testimony of LCpl Mendoza, if true, provides reasonable grounds to charge LCpl Tatum with murder of all seven victims in the back room of house 2. Two additional charges are also supported, attempted murder under Article 80 and assault with a dangerous weapon Article 128 toward Safah. Liability under these circumstances cannot, and should not, be limited to whether rounds from LCpl Tatum's rifle impacted a particular victim. If LCpl Tatum had advanced knowledge that there were women and

children in the back room and no hostile intent or act was perceived, his entry into the room would require positive identification before firing his weapon. Under the theory the government alleges, LCpl Tatum and SSgt Wuterich were acting in concert, and each through conspiracy and or aiding and abetting principles of liability is equally responsible for the death of all victims. Additionally, it is actually impossible for the government to provide evidence that rounds from a particular weapon or position were the actual cause of death of any victim. Using principal theories of conspiracy or aiding and abetting, proof that the actions of one or the other caused the death may overcome the legal difficulties of proving causation provided Safah is willing to testify that each person was alive prior to the firing occurring.

However, having a basis for reasonable grounds is not the same as recommending these charges be referred to trial. Significant and potentially impossible to overcome legal obstacles along with credibility issues with the evidence requires careful analysis before deciding the best course of action.

In order to make a recommendation I found it constructive to assess the strengths and weaknesses of the two primary witnesses that are likely to bear on the issue of LCpl Tatum's *mens rea*. That is testimony of LCpl Mendoza and the statements of LCpl Tatum.

LCpl Mendoza killed two unarmed men. The first, Guhid, he testified he considered had hostile intent when he turned to go into a closet. The second, Yunis, he shot upon being ordered by SSgt Wuterich. He has since been given testimonial immunity and testified believing he would not be prosecuted for his actions in house 1 or 2. Witnesses that testify under grants of testimonial immunity and can be viewed as co actors must be examined closely. LCpl Mendoza admits to providing previous false sworn statements and also testified that he included into his statements "facts" which he did not know but adopted based on representations of NCIS. (See transcript of LCpl Mendoza's testimony where he informs the IO that he included "facts" in his sworn statement because NCIS told him, not because he knew it was true.)

Problematic with his version of events is Safah witnessing a Marine tossing a grenade into the room and that the Marine who entered and began shooting was shorter than LCpl Tatum who is over six feet tall. Additionally, LCpl Mendoza claims that LCpl Tatum was in the hallway but there is no mention of where SSgt Wuterich is located. It seems odd that a conversation would occur in this relatively short hallway and SSgt Wuterich would pass them to enter the room first. LCpl Mendoza testified that he did not witness what happened in the room and that he was not sure if something happened that gave rise to hostile intent or act. Finally, it is difficult to believe that LCpl Mendoza decided to protect his fellow Marines who he believed murdered 7 women and children and only after he is given testimonial immunity for his actions, he decides he no longer wants to protect them and provides a version of events that implicates LCpl Tatum. More likely, he provided a version of events to his counsel and that was part of the negotiations with the government for testimonial immunity. Furthermore, his demonstrated malleability to the truth and ease of manipulation by counsel makes his credibility highly suspect and in my opinion, it is not prudent to base a prosecution primarily on his testimony.

24

LCpl Tatum provided several statements to NCIS investigators that are all consistent with the forensic evidence but contradicts LCpl Mendoza's statements in that he maintains always that he did not know there were women and children in the back room of house 2 prior to entry. LCpl Tatum's unsworn statement at the Article 32 denies he identified women and children before shooting. Essentially, the only contradictions are whether he was informed of the presence of women and children and whether he admitted to identifying them prior to shooting. All other facts he relates seem to be consistent.

If all of LCpl Tatum's statements are taken as true, the facts become that he is inside house 2, believes it is hostile because he witnesses LCpl Mendoza shoot a man and is ordered to and does, throw a grenade into another room. While checking additional rooms he does not throw more grenades but does look inside. While looking inside one room he hears gunfire from the adjacent room and responds. He sees SSgt Wuterich shooting at targets to the back right of the room. As he enters the room he turns to his right and makes out targets on a bed. He is in the process of engaging those targets when he recognizes that they are children. He fires his weapon in the general direction of the children then exits the room and house.

Assuming the above is all true, the issue then becomes what I posed to counsel, can or should he be able to rely on SSgt Wuterich's decision to employ deadly force or should he make an independent determination? If LCpl Tatum did see children as he entered the room, does he assume that SSgt Wuterich is wrong for firing? Did he have a duty to stop SSgt Wuterich? If so, how can he be sure that there wasn't an insurgent behind the children or that the women or children were not hostile? If he is not required to make an independent determination but SSgt Wuterich is violating the law, is LCpl Tatum also responsible? These are the questions the government must address and make a decision on how they plan on proceeding if charges are referred in this case

## Legal Issues

There are several legal issues involved in this case to which I have alluded in my analysis of the evidence. Although an Article 32 is not a forum to resolve issues of admissibility at a trial, it is important to advise when evidence produced at an Article 32 is unlikely to be admissible or there are questions as to its admissibility. In no particular order of importance the following non exhaustive concerns are raised by the evidence.

- 9 May 2007 statement testified to by Special Agent Marshall was not recorded or reduced to a sworn statement. LCpl Tatum requested to end the interview and seek legal counsel and an issue as to whether that invocation of the right to end the interview and receive legal counsel was scrupulously honored.

- 19 May 2007 statement to NCIS may be derivative of the statement obtained on 9 May 2007. Again statements on this date attributed to LCpl Tatum are not recorded or reduced to a sworn statement.

- IE 61, 62, 63 are transcripts of interviews of Eman, Abd and Safah. They ARE NOT accurate translations of what these witnesses said. They are the words of an interpreter who asks much more than the question calls for and the answers recorded in the transcript are an interpretation and in my opinion an extrapolation of what the witness said. To appreciate this one must watch the video while trying to follow along on the transcript. The transcript without the video is misleading, and the statements made by the interpreter will be inadmissible at a trial.

- A deposition of Eman, Abd and Safah is likely to be requested and ordered by a court. Failure to obtain a deposition may lead to an abatement of the proceedings if any charges other than reckless endangerment are referred. The government responded that "it is irrelevant" for the Article 32 if the witnesses are willing to testify. I disagree. However, because the government believes it is irrelevant, it is likely that they will not testify which will cause not only issues of exculpable evidence being denied to the defense, but the likelihood that there will be a significant impact on the ability of the government to prove any of the charges. Notwithstanding the "interviews" problems noted above, none of the testimony attributed to any Iraqi witness that was admitted at the Article 32 is admissible at a trial. All these interviews will fall under the rule of hearsay and admissibility of such statement would deny the accused his sixth amendment right to confrontation.

- Sgt Salinas will likely need to be charged or granted testimonial immunity. It is unlikely that a court will allow the government to make him unavailable by not charging him and refusing to extend him immunity.

- A request for exhumation of the bodies and an autopsy is likely to be filed and if denied, may lead to the court abating the proceedings or limiting some of the government's evidence.

- Issues of unlawful command influence were raised by the defense in relation to the Honorable John Murtha, Congressman from Pennsylvania. Although I am unaware of any unlawful command influence at the Article 32 level, depositions are likely to be ordered.

- With no autopsy, LtCol Rouse cannot determine cause of death. Outside a court room it is easy enough to conclude that the individuals were killed by LCpl Tatum and SSgt Wuterich. In a court of law, proving these individuals were alive, and that the proximate cause of their death was from the actions of LCpl Tatum is extremely difficult with the available evidence and especially if the Iraqi witnesses do not cooperate and testify at trial.

26

<u>**Recommended disposition of Charges**</u>

I recommend withdrawal and dismissal of all charges. There is insufficient evidence to find reasonable grounds for offenses charged based on events in house 1 and although there are reasonable grounds for charges arising out of the events in house 2, I do not recommend referral of those charges. The evidentiary hurdles are too great, and basing a prosecution on LCpl Mendoza's testimony is too weak a case to warrant referral to a trial.

Despite my recommendation to withdraw and dismiss, if charges are referred, I recommend that the charges for events in house 1 be changed to Article 119 (Voluntary manslaughter). Negligent homicide is a lesser included offense and the government theory better tracks that the killing was done as a response to the IED explosion and was an emotional response with the intent to kill insurgents. I would further recommend charging LCpl Tatum with seven specifications under Article 118(2) for all seven victims, one charge and specification of Attempt to commit murder under Article 80, one charge and specification of Aggravated Assault with a dangerous weapon under Article 128 as a contingency of proof to the attempt charge, and one specification and charge of Reckless Endangerment under Article 134.

**Charge I:  Violation of Article 118(2) Murder**

Remove the language "*identified as number 14*" and "*identified as number 11*" in each specification.

**Charge II:  Withdraw**

**Charge III: Violation of Article 128 (strike "III" and renumber "II")**

Insert after the word grenade the following "*and or an M16A4 weapon*".

**Add Charge I:  Violation of Article 80 (Attempted murder)**

*In that Lance Corporal Steven B. Tatum, U.S. Marine Corps, on active duty, did, at or near Haditha, Iraq, on or about 19 November 2005, attempt to with the intent to kill or inflict grievous bodily harm, murder Safah Salim Rasif by shooting at her with an M16A4 weapon.*

**Add Charge II  Violation of Artilce 118(2) Murder**

*In that LCpl Steven B. Tatum, U.S. Marine Corps, on active duty, did, at or near Haditha, Iraq, on or about 19 November 2005, with the intent to kill or inflict grevious bodily harm, murder _____ by shooting (him/her) with an M16A4 weapons.  (5 specificiations for those in back room of house 2 not already charged under Charge I)*

27

### Add Charge III:  Violation of Article 119 (Voluntary Manslaughter)

*In that Lance Corporal Steven B. Tatum, U.S. Marine Corps, on active duty, did, at or near Haditha, Iraq, on or about 19 November 2005, willfully and unlawfully kill _____ by throwing a grenade into a room where (he/she) was located and/or shooting (him/her) with his M16A4 weapon.*  **(5 specifications, 1 for each victim)**

### Add Charge IV:  Violation of Article 128 (Aggravated Assault-Dangerous Weapon)

*In that Lance Corporal Steven B. Tatum, U.S. Marine Corps, on active duty, did, at or near Haditha, Iraq, on or about 19 November 2005, commit an assault upon Safah Salim Rasif, by shooting at her with a dangerous weapon to wit: an M16A4 weapon.*

### Add Charge V:  Violation of Article 134 (Reckless Endangerment)

*In that Lance Corporal Steven B. Tatum, U.S. Marine Corps, on active duty, did, at or near Haditha, Iraq, on or about 19 November 2005, wrongfully and recklessly engage in conduct, to wit: he fired his M16A4 weapon into a room without making positive identification of a hostile act or intent from within the room, conduct likely to cause death or grievous bodily harm to women and children within the room.*

In my opinion the only charge the government can reasonably expect to be able to prove is the Article 134 reckless endangerment offense.  The elements of that offense are:

1) That (*state the time and place alleged*), the accused did engage in conduct, to wit: (*describe the conduct*);

(2) That the conduct was wrongful and reckless or wanton;

(3) That the conduct was likely to produce death or grievous bodily harm to another person; and

(4) That, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.

Notwithstanding my belief that a case against LCpl Tatum is too weak to pursue, the charge of Reckless Endangerment may avoid the most significant evidentiary problems of proving cause of death and Iraqi witness production while ensuring a trier of fact could hold LCpl Tatum accountable in some way for his actions.  If the government prevails on a theory that LCpl Tatum had a duty to make an independent determination of hostile act or intent, then the act of shooting into a room without making that determination is "Reckless" conduct that exhibits a culpable disregard of foreseeable consequences to the children.

However, to be clear, I am not recommending the charges go forward. In recommending dismissal of the charges, I am finding that LCpl Mendoza's testimony is not credible and even if all the evidentiary hurdles are cleared, that LCpl Tatum had the legal right to rely on SSgt Wuterich's actions in house 2 as positive identification. Even if SSgt Wuterich were wrong, LCpl Tatum was entitled to act on his honest and reasonable belief that SSgt Wuterich was engaging legitimate targets. On 19 November 2005, in the mere seconds LCpl Tatum had to make a decision, he acted in accord with training, to engage targets that a fellow Marine was firing at, without time to fully assess the situation and reflect on what SSgt Wuterich was doing. It is only in hindsight that we can start to question why SSgt Wuterich was firing his weapon at children and conclude that LCpl Tatum should have deemed such actions were unwarranted.

I believe LCpl Tatum's real life experience and training on how to clear a room took over and his body instinctively began firing while his head tried to grasp at what and why he was firing. By the time he could recognize that he was shooting at children, his body had already acted. What occurred in house 1 and house 2 are tragedies. The photographs of the victims are heart wrenching, and the desire to explain this tragedy as a criminal act and not the result of training and fighting an enemy that hides among innocents is great. However, in the end, my opinion is that there is insufficient evidence for a trial. LCpl Tatum shot and killed people in houses 1 and 2, but the reason he did so was because of his training and the circumstances he was placed in, not to exact revenge and commit murder.